Lewis P. CABOT, and Daniel
J. Quinn, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 92–315, 92–457T.

United States Court of Federal Claims.

Aug. 25, 1997.

Richard d'A. Belin, Boston, MA, for plaintiffs.

Karin L. Moss, Washington, DC, with whom were Assistant Attorney General Loretta C. Argrett, and Chief, Court of Federal Claims Section Mildred L. Seidman for defendant. Mary M. Abate of counsel.

*OPINION*

LYDON, Senior Judge:

Plaintiffs, Lewis P. Cabot (Cabot) and Daniel J. Quinn (Quinn), bring this suit to recover refunds of payments made by them towards penalties assessed against each of them, pursuant to 26 U.S.C. § 6672(a), for failure to withhold and pay over the federal employment payroll taxes, totaling $167,529.60, of Rolair Systems, Inc. (Rolair), for the second, third, and fourth quarters of 1984. Defendant counterclaimed for the balance due from plaintiffs on the penalties that had been assessed. The case was tried over a period of four days in Washington, D.C. For the reasons given below, the court finds that Cabot was under a duty to collect and pay over to the Internal Revenue Service the payroll taxes of Rolair and that he willfully failed to do so with respect to the second, third, and part of the fourth quarter of 1984. Thus, the court finds Cabot liable for the penalty assessed against him pursuant to section 6672(a). However, the court further finds that Quinn was not under a duty to collect and pay over said taxes during the second, third, and part of the fourth quarter of 1984 and that, therefore, he was not liable for the penalty provided for in section 6672(a).

**BACKGROUND**

Rolair was a California corporation that manufactured and sold equipment and technology licensing for air film and air bearings used in materials transport. Rolair was founded in 1968 largely through the efforts of Terry Baker (Baker) and Robert Kieding (Kieding). Cabot is a private investor who had initially acquired a small interest in Rolair in the 1970's. By 1979, Cabot acquired majority control of Rolair. In August 1980, Cabot was appointed to Rolair's Board of Directors (Board), and in March 1981, he became Chairman of Rolair's Board and continued to serve in that position until Rolair ceased operations. As of January 26, 1981, Cabot owned more than 90 percent of Rolair's stock. During all periods in issue, that is, the second through fourth quarters of

1984, Cabot owned 97 percent of Rolair's stock.

In addition to his interest in Rolair, Cabot has been the sole owner, since 1977, of Southworth, Inc. (Southworth), a corporation headquartered in Portland, Maine. Like Rolair, Southworth manufactured materials handling equipment; but Southworth specialized in standard products, such as lift tables and machinery used in paper mills, furniture and electronics manufacturing. Cabot became Chairman of Southworth's Board of Directors in 1977. Quinn became an employee of Southworth's in the early 1970s. In early 1983, Quinn became President of Southworth and served in that capacity until he left in 1991. As president Quinn was also a member of Southworth's Board of Directors. LPC Investments, Inc. (LPC Investments) was a holding company wholly owned by Cabot, formed in March 1983, as a California corporation. Prior to July 1983, Cabot transferred his ownership of Rolair stock to LPC Investments. In late 1982, Cabot had entered into an agreement to acquire majority control of Rolair's English licensee company, Hovair Ltd. (Hovair), by investing approximately $150,000 in Hovair. Like Rolair, Hovair was in the air film industry. Cabot negotiated the investment terms with Brian H. Wright, Hovair's President and Chief Executive. Through the acquisition, Cabot obtained 51 percent of Hovair's stock.

Attorney Robert L. Birnbaum (Birnbaum) and his law firm, Foley, Hoag & Eliot, were Cabot's personal attorneys and attorneys for Southworth prior to and during the periods in issue. Birnbaum was on Rolair's Board prior to the periods in issue. Prior to and during the periods in issue, Attorney John S. Poucher (Poucher) was Rolair's Assistant Secretary. Poucher and his law firm, Hollister and Brace, of Santa Barbara, California, were corporate counsel for Rolair.

Rolair had always had financial problems. During the period Cabot was Rolair's majority owner, Rolair generally lost money. At trial, Cabot referred to Rolair as his "sick

puppy" and to Southworth as his "successful puppy." Cabot further testified that during the first half of 1984 he spent the majority of his time equally between Southworth and trying to find a fix for Rolair.

In May 1982, Cabot offered Baker the position of President of Rolair,[1] replacing Shelby Morley (Morley) who had been terminated by Cabot after approximately one year in office. Baker, like Morley before him, was elected to serve on Rolair's Board. As Rolair's president and as a member of its Board, Baker was actively involved in the oversight of Rolair's finances and its financial performance. As president, Baker and Sigrid Ecker (Ecker), Rolair's treasurer/secretary, would routinely make decisions on payables. On occasion, however, Cabot would direct Baker to pay a certain creditor over another. At trial, Baker recalled that there were a couple of instances where Cabot directed him to "[g]et them [Foley, Hoag & Eliot] paid."

When Baker became president of Rolair he found that the previous management had restructured the manufacturing and sales functions so that production costs were vastly increased. As a result, when Baker became president, Rolair's existing line of credit was exhausted and Baker reported to Cabot that increases in the line of credit would be necessary. Baker testified that if he had gone to the bank and asked for a significantly large draw, even though it was within the lines of credit, that would have, in his opinion, triggered a requirement to "[d]iscuss it with Lewis."

Rolair's financial and accounting matters were routinely discussed at its board meetings, in which Cabot took an active role. Ecker was responsible for sending Rolair's quarterly, and then monthly financial statements to Cabot. When Ecker's reports were late, Cabot would demand that Baker get the reports to him. Indeed, in late February 1984, Ecker was on Cabot's "hit list" to be fired if she did not get the monthly reports to him quicker. Cabot would also require supplementary financial reporting when he

---

1. Baker had left Rolair in the mid–1970s to work for Rolair's British licensee, Rolair Systems Ltd.,  and later for Aero–Go, a competitor of Rolair.

was asked to guarantee additional loans for Rolair.

In a June 1, 1982 letter to Cabot, Baker discussed Rolair's cash flow requirements. Baker wrote that "[t]here are some hard realities to face here, in that (1) a start must be made to reduce an extensive accounts payable overhang...." Subsequently, Rolair's Board held a special meeting by telephone conference call on June 11, 1982. During the meeting Baker told the other directors (at that time Cabot, Birnbaum, and Kieding) that Rolair was in need of increased financing in order to meet its cash flow requirements until the end of the fiscal year. A copy of the cash flow projection had been provided to the directors. Further, it was determined that any increase in the line of credit would have to be personally guaranteed by Cabot, which Cabot agreed to do up to a maximum of $185,000. The Board unanimously adopted a resolution allowing Baker and Ecker to borrow from City Commerce Bank on a line of credit previously established which had been personally guaranteed by Cabot. Poucher, Rolair's Assistant Secretary, and Birnbaum noted that Rolair's continued survival depended on the bank line of credit, and that the line of credit would not exist without Cabot's personal guaranty. Hence, Cabot personally assumed the entire financial risk of Rolair without any of the other shareholders bearing any personal risk.

In October 1983, Baker met with plaintiffs in Portland, Maine, to discuss various ways to stem Rolair's financial decline. Baker learned from these discussions that plans were under way to form a holding company for Cabot's companies. Baker understood from this meeting that:

we are moving towards creating a new holding company that would provide a unified management and an overview of [Lewis's various] operations in the Material Handling field. For purposes of discussions (sic) I will describe this holding company as Southworth International to distinguish it from Southworth as it now exists and operates.

Southworth International would be a management and financial concern that would have general overview of the several entities that we defined in the meeting. One of these entities being Southworth, the other being Rolair, the other being the various distribution or sale companies related to Southworth, and finally, the 51% of Hovair.

Southworth itself, Rolair itself, Hovair itself, and any new organizations, will remain independent operating entities responsible for their own profits and losses. The day-to-day operation of these entities would remain under the independent control of the existing managements. *Southworth International, drawing to some extent upon existing resources at Southworth, would provide a centralized financial and accounting system,* and would provide a sales and management overview for all the operating entities....* (Emphasis added)

Pursuant to the plan, Cabot would be chairman of the new holding company's board of directors, and the officers would be Quinn (president), Baker (executive vice president), and Ed Bisson (Bisson), Southworth's chief financial officer, (vice president and treasurer).

On December 2, 1983, Baker wrote to Cabot to follow up their recent telephone conversation during which they discussed Rolair's continuing cash flow problems. Baker stated:

The current cash flow analysis I have, which was completed November 23, 1983, indicates a severe problem. This is caused by the continued low Standard Product Sales, the staffing demand to handle current customs jobs and the attempt to start over again to establish a sales network.

I expect to exceed the current line of credit by December 29, 1983, which means the payroll of January 5, 1984 cannot be met.

I will obviously have to take action to protect the companies (sic) officers and directors interests before this happens.

In response to Baker's letter, Cabot authorized an increase in Rolair's line of credit.

Allied Systems, Inc. (Allied), was a California corporation formed by Joseph Babic (Babic) in the early 1980's. Prior to forming

Allied, Babic was the western regional sales manger for Southworth. While working at Southworth Babic reported to Quinn, who was at that time vice president of marketing. Both Babic and Quinn considered each other friends. Babic's entire career prior to forming Allied was basically in sales. He never was employed in any accounting or financial capacity. Allied's business involved purchasing equipment manufactured by Southworth, and incorporating it into handling systems that Allied engineered and designed for its customers. After its formation by Babic, Allied was a West Coast distributor for Southworth's products. By September 1983, Allied's business had grown to where Babic had projected annualized sales in excess of $1.5 million. Allied had no bank loans, or any other debt other than trade payables (the largest payable was to Southworth for approximately $55,000). Babic hired Lois Curtis (Curtis) to be Allied's office manager on or about January 23, 1984, and hired Betty Sutton (Sutton) as Allied's bookkeeper shortly thereafter. Curtis understood her responsibilities at Allied to include answering the phones, processing the mail, supervising the accounts receivable, accounts payable, and other accounting work. Sutton was responsible for Allied's payroll. Prior to hiring Sutton, Babic had an outside accounting firm prepare Allied's books.

In early December 1983, Cabot asked Quinn to visit Rolair to evaluate its operations and to provide him with insight as to what the source of its problems were and what possible solutions might be available. While in California, Quinn visited Babic, his friend and former employee, at Allied. During this visit, Babic asked Quinn for advice on how to obtain financial backing or bank credit lines for Allied, and "jokingly" asked Quinn if Cabot would be interested in investing in Allied. Quinn did not immediately comment on Babic's suggestion. About two weeks later, however, Quinn called Babic with a "bizarre proposition" which involved Cabot's acquisition of Allied. After the acquisition, Quinn stated that Babic would be made president of Rolair and could use his entrepreneurial skills to turn Rolair around. Quinn assured Babic that he would receive an employment contract and a retirement package or "golden parachute."

After returning to Southworth, Quinn presented Cabot with a memorandum on the state of Rolair's operations. In Quinn's December 12, 1983 memorandum, he reported that the situation at Rolair was worse than he had thought. Cabot learned from Quinn that Rolair had the structural problem of too much overhead and too little sales and not much prospect that the sales would improve in the immediate future. Rolair was "in the untenable position of having a breakeven point which is higher than their (sic) sales prospects." One of Quinn's recommendations for turning Rolair around involved the "radical" move of merging "the bulk of the Santa Barbara operation [Rolair] into Portland [Southworth]," with all manufacturing, design, and marketing controlled from Portland. After the merger, the West Coast operation would be reduced to a two person sales office.

Quinn's "radical" merger alternative apparently appealed to Cabot and he asked Quinn to prepare a merger plan. Shortly thereafter, on December 28, 1983, Quinn presented his recommendations in a report entitled "Southworth–Rolair Merger Plan." In his report, Quinn also discussed the financial and managerial state of Allied. He noted that Babic's "business is growing faster than his financial or managerial capabilities will allow." In recommending a merger, which included Allied, Quinn stated that:

> the needs of Rolair and Southworth could be enhanced if Southworth took over Allied Systems and merged Rolair Systems under Allied. The Systems Sales and the necessary engineering personnel could work out of Thousand Oaks at Allied's facility. The production and engineering systems would be kept separate from Southworth. *The financial control and administrative controls would be retained by Southworth.* (Emphasis added).

Quinn's prior relationship with Babic was another factor in favor of merging Rolair with Allied. Quinn wrote the following about Babic:

> The final element is that Joe Babic is a known quantity by Southworth who under-

stands the systems and the management of Southworth. Southworth, on the other hand, understands Joe Babic's capabilities and methods of operation. It is clear that this type of operation fits will (sic) into Joe Babic's capabilities and interests.[2]

In January 1984, at Quinn's suggestion, Doug Libby (Libby), Southworth's controller, visited Allied to review its books. During his stay, Libby made photocopies of Allied's books and business records, and interviewed Allied's employees. Libby took numerous copies of Allied's financial records back with him to Southworth. Thereafter, in early February 1984, Cabot and Quinn met with Babic at Allied's office in Newbury Park, California. At that meeting Cabot offered to buy Allied for approximately $87,000, merge it with Rolair, and make Babic president of the merged companies. During the negotiations, Cabot told Babic that Southworth and Quinn would provide assistance, and that Babic should take direction from Quinn. Babic, after some reflection, accepted Cabot's offer, and the deal was sealed with a handshake. Cabot promised to send a letter of intent to bind their agreement and that a check would be forthcoming to consummate the agreement.[3]

At the March 13, 1984 meeting of the Rolair Board, Cabot terminated Baker as President of Rolair. Babic was made President of Rolair but, unlike his predecessors, he was not elected to serve on Rolair's Board. After Baker's removal from Rolair's Board, the Board consisted of Cabot and Robert Kieding. Cabot was aware of Babic's financial and managerial limitations when he appointed him president of Rolair. Cabot testified that he knew Babic "had relatively little experience preparing budgets and he had relatively little experience operating the company under the overview of a budget." He hoped for some measure of control by having Babic operate under a budget. Nevertheless, Cabot made Babic president of a company with a history of chronic cashflow problems and ongoing losses. Under Cabot's plan for a holding company, however, Babic's inexperience would be of no consequence because Rolair's financial and administrative matters would be managed by Southworth.

In April 1984, Cabot negotiated and personally guaranteed the lease for Rolair's new offices in Ventura, California.[4] On May 1, 1984, both Allied and Rolair moved from their separate facilities to the new location in Ventura, which was the approximate half-

---

**2.** Contrary to the support for Babic expressed in Quinn's report, at trial Cabot characterized Quinn's proposal of Babic for Rolair's president as "reluctant."

**3.** After Babic's March 14, 1984 meeting with Cabot and Quinn, he sent a letter to Poucher recapping the substance of the sale agreement. Babic's letter stated in part:

> The total amount is $87,165.00; $30,000.00 to be paid at the time of the acquisition, and the balance of $57,185.00 plus a yet-to-be agreed amount of interest to be paid in two equal installments 12 and 24 months, respectively, from the date of the merger.

By August 30, 1984, Babic had been advanced only $10,000 of the purchase price. Babic sought Quinn's help in getting the balance from Cabot. Babic wrote:

> ... In view of the present situation (no actual "merger" of Rolair—Allied, lack of effort to conclude the purchase originally agreed upon over 6 months ago, no employment contract with bonus provisions as discussed in January and February, the preexisting financial condition of Rolair precluding any bonus that may have been agreed on, Rolair's potential of becoming a division of Southworth thereby less-

ening even more the opportunity to become a successful 'stand alone' company with bonus and growth potential, etc.) I feel the time schedule for payment should be advanced, and that I be paid the balance of $77,185.00 with interest from March 19, 1984 (the date I became an employee of Rolair)....

> As you know Dan, I started Allied to eventually become my 'security blanket' to provide employment and income for Elaine and I in our advancing years. Of course, while there was no guarantee of success, I had more complete control over the outcome of the situation than I have with my future at Rolair as an employee. At this point in time, Allied is a dead company, and I could not restart it if I tried....

> As a friend, and my superior, I am asking you to assist us in settling this matter as soon as possible.

Babic eventually sued Cabot in a California state court for the balance of the purchase price. The parties settled out of court.

**4.** Quinn opposed leasing the Ventura facility for Rolair because it was too big and too expensive. Cabot, however, sided with Babic and as discussed above negotiated and guaranteed the lease.

way point between their former facilities. At the time of the move into the Ventura facility, Allied had nine or ten employees and Rolair had thirty-five to forty. Allied essentially ceased to exist when Allied and Rolair combined operations under the name Rolair, on May 1, 1984; however, Allied and Rolair never formally merged, and their books and financial affairs remained separate, only the physical plants were merged. Lois Curtis became Corporate Services Manager after Allied moved to Ventura. In another personnel change, Cabot terminated Ecker prior to the move to Rolair's new Ventura facility. Babic, as president, did not have much input into Ecker's termination.[5] Babic testified:

Q: [Was Sigrid Ecker] Terminated with your concurrence or over your objection or you sat mute?

A: Probably a little bit of all three of the above.

Babic testified that he would have welcomed Ecker at Rolair as either an advisor, consultant or retained in some capacity to help with the transition. When Babic and Curtis assumed their positions at Rolair, they learned for the first time that Rolair was on a C.O.D. basis with many of its suppliers.

Plaintiffs vigorously dispute that Cabot's plan for a holding company, i.e., Lepica, was formalized; they concede only that it was an idea that was discussed and considered. While it is not clear from the record whether Lepica had been formally incorporated, the record supports a finding that, at the very least, substantial steps were taken towards making Lepica a reality, and that Cabot proceeded as if it did exist. For example, on February 14, 1984, Cabot left a telephone message for Poucher asking for advice on merging Rolair and Allied, and also informed Poucher that he wanted to create "a holding company which will hold either the merged companies, or the two separate companies, or the two separate companies and the ownership of Southworth and [Hovair]." Poucher's notes of a telephone conference with Cabot, dated February 22, 1984, indicate that Lepica

had been formed "last week." Likewise, in a March 12, 1984 letter addressed to Rolair's Board (which at that time consisted of Cabot, Baker, and Kieding), Cabot stated in part:

As you know, I have organized Lepica Corporation as a holding company for the material handling group. The organizational structure within the group (summarized in the attached chart) places Southworth, Rolair, Allied and Hovair as separate subsidiaries of Lepica. Although Allied and Rolair may be merged at some time in the future, based upon a consideration of the management, profitability and contingent and other liabilities of the two companies at that time, such merger is not presently contemplated....

As chief operating officer of Lepica, Dan Quinn will work closely with the board of directors of each company in establishing policies, will otherwise exercise Lepica's rights as controlling stockholder of each company, and will supervise the accounting and other overhead services provided by Lepica to members of the group. Because of the similarity in their respective businesses, the management of Allied and Rolair will be expected to cooperate closely. Joe Babic will become director and chief operating officer of Rolair, with his salary partially paid by Rolair.

The chart referred to in Cabot's letter places Cabot at the head of the organizational structure controlling Lepica, which in turn controlled Southworth, Allied, Rolair, and Hovair. By the next meeting of Rolair's Board held on March 13, 1984, Cabot had acquired Allied and had finalized his acquisition of majority control of Hovair, Ltd. Lepica was one of the parties named in the final agreement documenting Cabot's acquisition of 51 percent of the stock of Hovair, Ltd., and Lepica was the registered owner of shares of stock on Hovair, Ltd. Poucher's notes of a telephone conference between Cabot and Babic dated April 17, 1984, state that Lepica was to buy Allied.

---

5. There is some evidence in the record that Babic made decisions regarding personnel changes in May 1984, when Rolair and Allied moved into the Ventura, California facility. Babic testified that he had authority to fire personnel, but that he would get Quinn's advice before proceeding because he was asked to report to Quinn.

Additionally, a number of events in the record persuade the court that Lepica was more than just an "idea." In March and April 1984, Curtis and Sutton went to Rolair's facility (located in Goleta, California, at that time) and met with Bisson, Southworth's chief financial officer. Bisson was in California to assist in converting Rolair's and Allied's accounting systems so that they would be identical to, and compatible with, Southworth's. Later, in July 1984, Curtis, at Quinn and Bisson's request, went to Southworth's offices in Maine to learn about Southworth's administrative and accounting systems. Bisson visited Rolair in mid-March for a period of three days; in late June, with Quinn, for a period of five days; and, in early July, again with Quinn, for another five days. Then on September 12 and October 24, 1984, Saul Greene, a Southworth consultant, visited Rolair for a period of three days to review Rolair's financial system and operations.

Also, during a May 1984 visit to Rolair, Quinn explained to Babic, Curtis, and the other Rolair employees, that a holding company was now going to be over Southworth and Rolair, and that Quinn was in charge of the holding company. After this meeting, Babic and Curtis believed they reported to Quinn. Babic testified that his understanding of the hierarchy was that Curtis reported to Quinn on accounting and financial matters, and to Babic for the rest of Rolair's administrative functions. Curtis believed that she answered to both Quinn and Babic, and in the case of a disagreement between the two, she would follow Quinn. Quinn, it is not disputed, reported to Cabot on matters regarding Rolair. At Quinn's request, beginning with the May 1984 monthly report, copies of monthly financial statements for Rolair were prepared by Sutton, and sent each month to Quinn at Southworth where Quinn would, on occasion, review them before forwarding them to Cabot.

Not surprisingly, Babic had a difficult time managing Rolair. He found that employee dissatisfaction due to the change in management and the commute to Ventura was extreme. Several employees left, and the majority of those who stayed were unproductive. Babic also found that Rolair's sales organization was essentially nonexistent. After a quick audit and assessment of payables, receivables, and assets, it was clear to Babic that Rolair was virtually bankrupt. By June 1984, Babic was overwhelmed as a result of all the problems at Rolair and he told Quinn that, "I've almost had it." Babic was relieved when Quinn responded, "well . . . you take over the engineering, manufacturing, the sales responsibilities and . . . we'll handle the financial responsibilities out of . . . Southworth." Additionally, Quinn mentioned that a computer terminal would be installed at Rolair that would be connected to a terminal at Southworth to facilitate Southworth's access to Rolair's daily financial information.

Quinn and Bisson spent five days at Rolair beginning June 24, 1984. During this visit, Bisson spent the bulk of the time going over the accounting and books with both Sutton and Curtis, and implementing the compatibility of Rolair's accounting system with Southworth's. Quinn told Babic that eventually all Rolair payroll checks would be printed and sent out from Southworth via the computer. From that point on, Babic believed that all responsibility for financial and accounting matters was in the hands of Southworth. Babic did not concern himself with the financial reports because he believed he no longer had responsibility for finances and that he "had enough to do working 14, 16 hours a day just working with the manufacturing and engineering area." Babic trusted and held Quinn in high regard; Quinn would make his opinions known and Babic followed his suggestions and ideas more often then not. They had a very good relationship and Babic would tell Quinn about everything that was happening at Rolair.

Rolair's cash flow problems and C.O.D. status with many of its vendors required Babic to decide which vendors to pay and when. Accordingly, Babic would direct Curtis as to which vendors should be paid to keep the company going. Their practice was to go over the weekly vendor payable list together, and Babic would highlight which vendors should be paid that week from the money that had been made available to him. If Babic was away on business, Steve Betz

(Rolair's purchasing agent) or Curtis would make the decisions. The vendor payables list consisted of debts owed by Rolair to its suppliers, such as steel companies, motor manufacturers, and suppliers of welding equipment. It did not include rent, insurance or taxes. Rolair's payroll was prepared by Sutton, its bookkeeper. The payroll checks were signed by Babic. With the exception of deciding which vendors to pay, Babic did not have any significant involvement in Rolair's financial management.

In June 1984, Cabot invested an additional $150,000 of capital into Rolair. During Quinn and Bisson's June visit, they (without Babic) went to City Commerce Bank to request an additional loan in the amount of $150,000 for Rolair. On June 11, 1984, Cabot had written to Ed Mack, the bank's president, authorizing Rolair to continue use of his personal guarantee on a loan (not exceeding $235,000) for a year beginning June 22, 1984, and advising that Quinn and Bisson would be paying Mack a visit in June. As Rolair's president, Babic never directly sought financial assistance for Rolair from banks. He would ask Quinn to ask Cabot to infuse more money into Rolair. Similarly, Babic testified that there may have been a certain amount over which he would have had to get Cabot's authorization before he could draw on the line of credit.

In addition to being in a precarious financial position with its vendors, Rolair had legal bills outstanding to Hollister & Brace, Poucher's law firm. Significantly, instead of seeking payment for the unpaid legal services performed for Rolair from Babic, Poucher wrote to Quinn at Southworth. On August 20, 1984, Poucher wrote to Quinn, "As we have previously informed you, we are deeply concerned about Rolair's ability to pay its attorneys' fees.... [M]ost of our

fees are over a year old." Poucher's letter was copied to Cabot and Birnbaum. Poucher, who was Rolair's Assistant Secretary and participated in Rolair board meetings, obviously recognized that Babic was not the person to see at Rolair about financial matters.

Beginning in the second quarter of 1984, Rolair's payroll taxes were not being paid.[6] The record is not clear as to who first knew about the delinquency or when they learned of it. Babic testified that he first learned of a problem with unpaid payroll taxes in late November 1984, while on a business trip to Salt Lake City, Utah. Babic called Rolair and spoke with Curtis who told him that the payroll taxes had been overdue for several weeks and that she had received a notice from the IRS. After some further discussion, Babic advised Curtis to contact an attorney that he had previously dealt with regarding Rolair personnel problems to determine their potential liability for the taxes as officers of Rolair. After speaking with Curtis, Babic unsuccessfully tried to reach Cabot to discuss the tax delinquency. Babic, however, spoke to Quinn who allegedly reassured him that everything would be alright and told him "don't sweat it, companies borrow from the government all of the time."

Curtis testified that she first learned about the unpaid payroll taxes in September or October 1984, most probably from an IRS notice. After learning of the delinquency Curtis said she discussed the matter with Babic who said he would talk to Cabot and Quinn about infusing some additional funds to pay the taxes as well as other payables that needed to be paid to keep the company running. Curtis also spoke with Quinn about the taxes in either October or November. Quinn told her not to worry because Cabot would be putting additional funds into Rolair

---

**6.** Prior to its merger with Rolair, Allied had one incident where it was fined for being delinquent in its payment of federal withholding taxes. Curtis testified that she had timely deposited two checks for payroll taxes to the bank, but that the bank apparently sent them to the wrong address, instead of to the IRS. Sutton, Allied's bookkeeper, wrote to the IRS to explain the error, and the matter involving a $90 penalty was resolved.

While the testimony at trial indicates that after the Rolair/Allied merger Allied's employees were placed on Rolair's payroll, there is evidence in the record which indicates that Allied's payroll was kept separate from Rolair's during the periods in issue. In Poucher's memorandum of his January 29, 1985 interview with Curtis he notes Curtis' admission that Allied's payroll taxes were frequently paid late during 1984, but Allied was caught up by December 1984. There was no testimony at trial about Allied's payroll taxes during the periods in issue.

which could be used to pay the taxes. At trial, Cabot and Quinn denied any knowledge of the payroll tax delinquency prior to December 2, 1984.

In December 1984, Cabot and Quinn were at Rolair for at least two series of meetings, each lasting approximately one week. On December 3, 1984, the first series of meetings was held at Rolair attended, at various times, by Cabot, Quinn, Bisson, Babic, Tom MacIntosh (Rolair's chief engineer), and Curtis to discuss how much money it would take to make the company whole again. During this first series of meetings the participants received a list of payables that included Rolair's unpaid payroll taxes. Cabot and Quinn both contend that this was the first time they had been informed of the unpaid payroll taxes. MacIntosh described the first week of meetings as "fairly casual" and did not detect any surprise and dismay by Cabot or Quinn in reaction to the unpaid payroll taxes. Moreover, MacIntosh came away from the first series of meetings with the understanding that Cabot would put more money into Rolair. After the first day of meetings, however, Cabot and Quinn met with Poucher who advised them to seek counsel from an attorney specializing in bankruptcy law. On December 4, 1984, Cabot, Quinn, and Poucher had a meeting with bankruptcy attorney Jay Michaelson. Notes from that meeting show that as of that date, Rolair's federal tax liability was approximately $158,000, and that Cabot acknowledged that he owed Babic for the purchase of Allied. Cabot testified that after the first series of meetings his role with respect to Rolair changed from what he considered a "supervisory role to a very active role." At some point after learning about Rolair's tax delinquency, Cabot, on the advice of counsel, directed Curtis to pay one-half of Hollister & Brace's outstanding bill (Poucher's law firm), the interest owing to City Commerce Bank and to the Bank of Boston, Rolair's rent, and Rolair's payroll. The total amount disbursed was approximately $21,000.

On or about December 10, 1984 Cabot and Quinn returned to Rolair for the second series of meetings. Curtis gave the meeting attendees a revised list of Rolair's debts,

including taxes and other payables. Attendees of the various sessions of the December 10 series of meetings included: Cabot, Quinn, Bisson, Babic, MacIntosh, Kieding, Jay Michaelson (Cabot's bankruptcy counsel), and Brian Wright of Hovair. In contrast to the first week of meetings, the second week of meetings were marked by an "air of disappointment or frustration." The revised list of Rolair's debt's indicated that it would take substantially more money (almost double) to save Rolair than was suggested during the first set of meetings. The tone of the second series of meetings thus changed from one of try to save Rolair, to sell it to Hovair. At some point during this week, Babic became aware that Cabot had no intention of putting more money into Rolair to pay Rolair's delinquent payroll taxes. Furthermore, Cabot wanted Babic to use any receivables to satisfy the City Commerce Bank loan which he had personally guaranteed. Babic testified to the following encounter with Cabot after telling Cabot that he intended to direct that Rolair's accounts receivable be paid to the IRS to pay of the taxes:

A. .... [H]e said that I was to take the receivables as they come in and first attempt to pay down the credit line that he had guaranteed at the City Commerce Bank.

I remember becoming very angry, very upset. It appeared to me that if this were the case that I was going to be held liable for the payroll taxes and the penalty and became very upset.

I believe I—I can't recall exactly what I said, but I said something to the effect that as long as I'm president of this company that's what I'm going to do.

Q. Did he say something to you in response?

A. Yes. I can't remember whether he left or turned around or what happened, but I do remember the subsequent conversation basically was that he informed me that he had just had a board meeting in the men's room and he patted his pocket and said I have the board here in my pocket and we just terminated you as president.

The only directors remaining on Rolair's Board as of December 14, 1984, were Cabot and Robert Kieding. Babic left Rolair shortly thereafter, on December 14 or 15, 1984. Subsequently, either Cabot or Quinn made MacIntosh General Manager of Rolair.[7] Following Babic's departure from Rolair, Cabot told Curtis and Sutton which of Rolair's debt's to pay and not to pay. As of December 1984, Rolair's accounts receivable totaled between $350,000 and $650,000, but only approximately $6,000 had been collected.

During the later portion of the December 10 meetings, attorney Michaelson discussed the legal implications of Rolair's filing for bankruptcy, and what would happen if that occurred. An alternative to filing for bankruptcy was also discussed, whereby, Rolair's assets would be sold to Hovair (U.K.), the rationale being that in reality Hovair was Cabot. Either Cabot "and/or a legal firm" made the decision to not put Rolair into bankruptcy. Cabot put additional funds into Rolair that were used to pay payroll and current payroll taxes.

On December 14, 1984, Curtis called Cabot and gave him information regarding expenses that had to be paid to keep Rolair open, such as payroll and current withholding taxes. In that conversation, she asked him about paying the delinquent taxes, but Cabot told her that they could not be paid.[8] By letter dated December 18, 1984, the IRS sent Rolair a "Final Notice" to pay unpaid employment taxes of Rolair for the second and third quarters of 1984, totaling $117,283.88. No notice had been received regarding the unpaid taxes from the fourth quarter.

Eventually, Cabot opted to sell Rolair's assets to Hovair Ltd. The only problem with the plan to sell Rolair's assets to Hovair Ltd. was that Hovair Ltd. had no money. To get over this hurdle, they agreed that Cabot would lend Hovair Ltd. the funds to purchase Rolair's assets. Cabot directed that $50,000 be wired from an account at his bank, the Bank of Boston, to Rolair's account at City Commerce Bank, in two separate installments of $30,000 (on December 14, 1984) and $20,000 (on December 21, 1984). On January 17, 1985, Hovair Systems, Inc. (Hovair Systems) was incorporated by Poucher as a California corporation and wholly-owned subsidiary of Hovair Ltd. Hovair Systems was located at Rolair's address in Ventura, California.

## DISCUSSION

The Internal Revenue Code (I.R.C.) requires that certain employers withhold federal income and social security taxes from the wages of their employees. 26 U.S.C. §§ 3102(a), 3402(a). Withholding occurs each pay period, and payment is made to the government on a quarterly basis. Prior to the time they are paid over, the withheld taxes constitute a special fund held by the employer in trust for the government. 26 U.S.C. § 7501(a). The trust established by section 7501 is created when wages to the employees are paid. *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 60–61, 110 S.Ct. 2258, 2263–64, 110 L.Ed.2d 46 (1990). Generally, funds held in trust under section 7501 are not required to be segregated or specifically identified. *Id.* 496 U.S. at 61, 110 S.Ct. at 2264. Also, liability for the payment

7. After MacIntosh's appointment to general manager, Quinn would call him once or twice a week to discuss how the collection of receivables was going, how the production of air bearings for new orders was going, how the sales effort was going, whether Rolair was getting new orders or not, and whether or not Rolair was getting supplies from vendors. MacIntosh, a particularly credible witness, recalled one conversation in which Quinn said that he had prior knowledge that Curtis had not paid the taxes. From the context of their conversation, MacIntosh understood that Quinn had known about the unpaid taxes prior to the December meetings. While *MacIntosh's recollection corroborates Curtis' testimony that she told Quinn about the unpaid taxes prior to December, and therefore impinges

on Cabot and Quinn's credibility, the issue of when plaintiffs first learned about the tax delinquency is irrelevant to the question of their status as "responsible persons." *See Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed.Cir.1984).

8. On December 17, 1984, Curtis resigned from Rolair. Curtis wrote to Cabot:

Due to the fact that I have been instructed by you not to pay any state or federal taxes, plus having been notified by Tom MacIntosh that as of 12–15–84 I will no longer be authorized to sign on the Rolair checking accounts, effective today, December 17, 1984, I resign as Treasurer of Rolair Systems, Inc.

694

of withholding taxes arises at the time the sums are withheld from the employees' wages rather than at the later date when the employer's quarterly tax return is filed. *Bolding v. United States,* 215 Ct.Cl. 148, 158, 565 F.2d 663, 669 (1977). *But see United States v. Ressler,* 433 F.Supp. 459 (S.D.Fla. 1977), *aff'd* 576 F.2d 650 (5th Cir.1978), *cert. denied* 440 U.S. 929, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979) (stating that regardless of when federal taxes are actually assessed, the taxes are considered as due and owing, and constitute liability, as of the date the tax return for the particular period is required to be filed.).

The I.R.C. imposes personal liability upon persons responsible for overseeing the collection of taxes in instances where the taxes are not paid to the government. Section 6672 permits the IRS to assess a penalty against "any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof...." I.R.C. § 6672(a). The term "person" as used in section 6672 includes "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." I.R.C. § 6671(b). From these two statutory provisions, it is clear that, in order to be found liable for the penalty, an individual must have: (1) been under a duty to collect, truthfully account for, and pay over trust fund taxes; and (2) willfully failed to do so or willfully attempted to evade or defeat payment of the tax. The person described in sections 6671 and 6672 has been commonly referred to in the decided cases by the shorthand phrase "responsible person." *Slodov v. United States,* 436 U.S. 238, 246 n. 7, 98 S.Ct. 1778, 1784 n. 7, 56 L.Ed.2d 251 (1978).

■ In tax refund cases, there is a "strong presumption of the correctness of the findings" of the Commissioner. *Whiteside v. United States,* 26 Cl.Ct. 564, 566 (1992). Plaintiffs bear the burden of rebutting this presumption by proving by a preponderance of the evidence that they are not "responsible persons." *Pototzky v. United States,* 8 Cl.Ct. 308, 315 (1985). Of course, plaintiffs bear this burden as to each and every element of their claim.

Plaintiffs defend themselves on both of the grounds suggested above: first they argue they were not responsible persons during the periods in issue; second, they argue that they did not willfully fail to pay over the taxes withheld during that period.

**1. Responsible Person**

■ The determination of whether or not an individual is a "responsible person" requires a close examination of the facts of each case. *See Bauer v. United States,* 211 Ct.Cl. 276, 286, 543 F.2d 142, 148 (1976); *Pototzky,* 8 Cl.Ct. at 314. A "responsible person" is one who was under a duty to collect, truthfully account for, and pay over the taxes at issue. In order to make this determination, the court must look for those individuals who had "the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations." *Haffa v. United States,* 516 F.2d 931, 936 (7th Cir.1975), *quoted in Godfrey v. United States,* 748 F.2d 1568, 1574 (Fed.Cir.1984). A responsible person is one "with ultimate authority over expenditure of funds." *Godfrey,* 748 F.2d at 1575 (quoting *White v. United States,* 178 Ct.Cl. 765, 771, 372 F.2d 513, 517 (1967)).

■ The court must look beyond organizational form and look for those people "actually responsible for an employer's failure to withhold and pay over the tax." *Pototzky,* 8 Cl.Ct. at 314 (citing *Godfrey,* 748 F.2d at 1574). The court is required to focus on those facts bearing on an individual's "status, duty, and authority" within the employer corporation. *Greenberg v. United States,* 46 F.3d 239, 243 (3rd Cir.1994); *Gephart v. United States,* 818 F.2d 469, 475 (6th Cir. 1987); *Mazo v. United States,* 591 F.2d 1151, 1156 (5th Cir.1979); *Sale v. United States,* 31 Fed.Cl. 726, 731 (1994); *Hammon v. United States,* 21 Cl.Ct. 14, 24 (1990). "[A]ny person with sufficient status, duty and authority to avoid the default is a responsible person

under § 6672." *Sale*, 31 Fed.Cl. at 731 (quoting *Heimark v. United States*, 18 Cl.Ct. 15, 21 (1989)). There is, however, no fixed calculus for determining whether an individual's status, duties, and authority render him a responsible person. Further, an individual's knowledge of nonpayment is irrelevant in considering the question of whether he was a responsible person. *Godfrey*, 748 F.2d at 1576.

■ An individual's status is to be determined by reference to such things as his title or position within the corporate structure, as well as his ownership stake in the employer corporation. *Sale*, 31 Fed. Cl. at 731. However, the absence of any official corporate title will not suffice to remove liability. *Ghandour v. United States*, 36 Fed. Cl. 53, 60 (1996).

■ In *Godfrey*, the court stated that "a person's 'duty' under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds." *Godfrey*, 748 F.2d at 1576. A person's duties may be determined by reference to corporate by-laws and resolutions or to the duties actually performed by that person in the course of business. *Ghandour*, 36 Fed. Cl. at 61. "Ultimately, the crucial inquiry is whether a person had a duty to oversee, manage or administer the financial affairs of the company, specifically with reference to the paying of creditors and taxes." *Id.*

■ Similarly, authority turns on the scope and nature of an individual's power to determine how the corporation conducts its financial affairs; the duty to ensure that withheld employment taxes are paid over flows from the authority that enables one to do so. *Purcell v. United States*, 1 F.3d 932, 937 (9th Cir.1993). An individual will generally be held "responsible" where a person "has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, *or controls the voting stock of the corporation.*" *Godfrey*, 748 F.2d at 1576 (emphasis added, citations omitted); *White*, 178 Ct. Cl. at 777–78, 372 F.2d at 520. However, the mechanical duties of signing checks and pre-

paring tax returns are not determinative of liability under section 6672. *Godfrey*, 748 F.2d at 1575. All of these aspects of authority need not be present to establish section 6672 liability; some combination will generally show actual and sufficient authority for the tax penalty. As with other aspects of the responsible person test, this inquiry must focus on substance, not form.

## 2. Willfulness

■ After the court determines that an individual was a responsible person, the court must next ascertain whether that person acted "willfully" in failing to collect, truthfully account for, and pay over the withheld payroll taxes. I.R.C. § 6672(a). In *White* the Court of Claims stated that "it is not necessary that there be present an intent to defraud or deprive the United States of taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness." *White*, 178 Ct.Cl. at 778–79, 372 F.2d at 521. "Mere negligence" is insufficient to constitute willfulness under section 6672. *Godfrey*, 748 F.2d at 1577. Rather, the requisite "personal fault" may be shown in one of two ways: (1) a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the government or (2) reckless disregard of a known or obvious risk that the taxes may not be remitted to the government. *Godfrey*, 748 F.2d at 1578.

## A. The "Deliberate Choice" Standard

■ An individual has acted willfully if he made a deliberate and intentional choice to prefer other creditors over the government. In assessing willfulness under section 6672, the focus is on "the taxpayer's diligence in attending to the duty to pay employment taxes." *Hammon v. United States*, 21 Cl.Ct. 14, 27 (1990). In this connection, the use of "available corporate money for other business purposes," *Powell v. United States*, 9 Cl.Ct. 58, 62 (1985), when a responsible person has knowledge of a current tax liability will constitute a "willful" failure to collect, account for, and pay over the due employment taxes, under the deliberate choice standard.

## B. The "Reckless Disregard" Standard

Where a responsible person recklessly disregards a known or obvious risk that the taxes will not be paid to the IRS, and the taxes are in fact not paid, he has been "willful" as that term is used in section 6672 and may be assessed a penalty under that section. In *Hammon* the court laid out the test for recklessness under section 6672, delineating the following three elements: (1) the responsible person's knowledge (or reason to know) of a risk that taxes will not be paid, (2) a reasonable opportunity to discover and remedy the problem, and (3) a failure to undertake the reasonable efforts to ensure payment. *Hammon*, 21 Cl.Ct. at 29–30.

### Cabot

### 1. Responsible Person

■ Plaintiffs argue that the case for responsibility against Cabot is similar to the case against the plaintiff in *Godfrey*. Godfrey was the chairman of the Board, "the single most important individual directing the business affairs of the corporation" and "the one individual at the corporation to whom everyone looked for the ultimate financial, personnel and other management decisions." *Godfrey*, 748 F.2d at 1574. Godfrey took the lead in attempting to avoid the company's insolvency, negotiated emergency loans and recapitalization plans, helped to arrange for the sale of corporate assets, and participated in the hiring and firing of top corporate management. Nevertheless, the court found no "evidence that Godfrey had or exercised control of the collection, accounting for, and payment of taxes." *Id.* at 1576. Plaintiffs contend that the same is true of the evidence in this case.

Plaintiffs further contend that the central inquiry in determining whether an individual is a responsible person is whether the individual in question can fairly be said to control the decision-making process which caused the taxes to be unpaid. Plaintiffs argue that the following factors taken together support their contention that Cabot was not a responsible person: (1) Cabot was never an officer of Rolair; (2) Except for reimbursement of minimal expenses, Cabot was never paid by Rolair; (3) Cabot was not involved in Rolair's day-to-day business; (4) Cabot was never at Rolair during the period of the taxes at issue in this case (April to November 1984); (5) Cabot was not an authorized signatory on Rolair's accounts and did not sign any Rolair checks; (6) Cabot did not perform any functions with respect to preparation and payment of Rolair's payroll; and (7) Cabot did not prepare, review, sign or file any payroll tax returns (or any other tax returns) on behalf of Rolair. Further, plaintiffs' point out that Rolair's payroll taxes had been kept current under Baker, despite the fact that Baker had to deal with the same chronic cash flow problem which Babic had to deal with.

While the factors listed above are relevant to determining whether or not Cabot was a responsible person during the periods in issue, they do not, by themselves, persuade the court that Cabot was not a responsible person. The totality of the record persuades the court that Cabot controlled the decision-making process which caused the taxes to be unpaid during the periods in issue. First, Cabot terminated Baker as president of Rolair to fulfill his promise to Babic of making Babic president of Rolair after the Allied/Rolair merger. Cabot knew that Babic had limited financial and managerial skills and that he had little experience preparing and operating under a budget. Babic was not hired to turn around Rolair's financial misfortunes with any financial or managerial skills. Indeed, Babic was not a member of the Board as his predecessors had been. Babic was first and foremost a skilled salesman and was to use his sales skills to revitalize Rolair's sagging sales. Second, pursuant to Cabot's direction, Rolair's financial and administrative functions were being transferred to Southworth as part of the plan to consolidate all of his materials handling companies under Lepica.

■ Plaintiffs contend that payment of Rolair's payroll taxes was the responsibility of either Babic, Rolair's president, Curtis, its treasurer, or Sutton, its bookkeeper. It is well settled, however, that under section 6672, all responsible officers and employees of a corporation may be found jointly and severally liable. *Sale*, 31 Fed. Cl. at 732; *White*, 178 Ct.Cl. at 773, 372 F.2d at 517–18

(stating "that as long as a person has the ultimate authority to determine what bills to pay, he may be the responsible person, even though he is not the *actual disbursing officer* who mechanically receives and pays out corporate funds." (Emphasis in original)).

In *Purcell v. United States*, 1 F.3d 932 (9th Cir.1993), the Ninth Circuit addressed the issue of whether Purcell, the president and sole shareholder of the company, "can fairly be said to have 'had the final word' as to the payment of creditors" during the period in which Purcell delegated his authority to another and exercised no control of the company's day-to-day financial decision making. Purcell was held to be a "responsible person" despite the undisputed fact that he delegated all financial responsibility to a chief financial officer who embezzled the company's funds. The court concluded that:

> an individual may be said to have "had the final word as to what bills should or should not be paid" if such individual had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact. The authority that permits control carries with it a *nondelegable duty* to ensure that withholding taxes are duly collected and paid over to the government. (emphasis added)

*Id.* at 937. It is apparent from the record in this case that Cabot, as 97 percent shareholder and chairman of Rolair's Board, was the source of Rolair's final policy and fiscal decisions and therefore, he "had the final word as to what bills should or should not be paid."

Although not an officer of Rolair, Cabot was in every sense the boss. Cabot, as the majority shareholder and chairman of the Board of Directors, exercised complete authority over Rolair. As a member of the Board, Cabot was periodically informed of Rolair's financial situation, and Rolair's financial and accounting matters were routinely discussed at its board meetings. Moreover, Cabot sent Quinn to act as an advisor to Babic, and received reports from Quinn regarding Rolair's status during the periods in issue. Cabot also spoke directly to Babic for updates on Rolair's operations. Cabot admitted that as chairman of the Board he

"was doing more to interpret board policy than any other individual." Similarly, Baker testified that Cabot, as chairman, "was deeply involved in all this transition. There wasn't really, anybody else that was taking an active part." While these factors are similar to those the court weighed in *Godfrey*, Cabot, unlike Godfrey, was not an outside director, a fact the *Godfrey* court considered important in reaching its decision in that case. *See Godfrey*, 748 F.2d at 1576. In addition to all the factors listed above Cabot was a 97 percent shareholder of Rolair and personally guaranteed its lines of credit, whereas Godfrey was not a shareholder but was a partner in a business law firm with special tax expertise who was elected to the company's board of directors and subsequently became chairman of the board. Indeed, in *Godfrey*, the Federal Circuit noted that when a person controls the voting stock of a corporation he will generally be held "responsible." *Id.* at 1576.

With respect to Cabot's status at Rolair, the court finds the following facts relevant. Cabot was majority stockholder and chairman of the Board. In this capacity, Cabot presided at board meetings, negotiated and signed the Ventura lease, and personally guaranteed lines of credit. Cabot was not a passive investor, he was extensively involved in the management of Rolair. He kept informed of its financial status. It was his decision to proceed with the merger of Rolair and Allied, and later, with the transfer of Rolair's financial and managerial functions to Southworth. He made the decision to replace Baker with Babic as president of Rolair and removed Babic as president in December 1984. Thus, Cabot possessed sufficient status in Rolair to satisfy this aspect of the responsible person test. As chairman of Rolair's Board and majority stockholder, no one within Rolair exceeded Cabot's status, power, and authority.

Cabot also had significant duties at Rolair. Cabot had the overall financial responsibilities and duties at Rolair, including but not limited to, the following: (1) in-depth involvement in the financial affairs of Rolair; (2) reviewing periodic financial reports of Rolair; (3) making decisions about the finances of the

company; and (4) negotiating lines of credit with lenders.

Likewise, Cabot's authority at Rolair was significant. Cabot controlled 97 percent of Rolair's stock. Cabot negotiated Rolair's Ventura lease and personally guaranteed its corporate loans. He hired and fired Ecker, Baker, and Babic. Baker testified that when he asked Cabot for more money to meet Rolair's payroll and payroll taxes for January 1984, Cabot provided the money. In contrast, Babic requested additional funds beginning in October 1984 to pay Rolair's expenses, but none were provided until Cabot put more money into Rolair in mid-December—after Babic had been terminated. Cabot had authority to direct payments and did so on occasion. The fact that he did not exercise his authority constantly does not detract from his authority. *See Purcell,* 1 F.3d at 937. In December 1984, *after* learning about Rolair's unpaid taxes, Cabot directed Curtis to pay certain creditors including one-half of Hollister & Brace's outstanding bill, the interest owing to City Commerce Bank and the Bank of Boston, the rent, and the current payroll. In both substance and form, Cabot had sufficient authority to show responsibility under section 6672.

The court finds that Cabot, as 97 percent shareholder, guarantor of corporate loans, and chairman of Rolair's board, was the single most important individual at Rolair. Under Cabot's direction, financial and administrative functions were transferred from Rolair to Southworth during the periods in issue. This transfer was done to provide a central management for Cabot's materials handling companies. Additionally, Cabot was aware of Babic's inexperience with financial and managerial issues, and the transfer of those functions from Rolair to Southworth relieved Babic of any such duties. Thus Cabot controlled the decision-making process which caused Rolair's taxes to go unpaid.

In sum, Cabot had sufficient status, duties, and authority to show responsibility for violation of section 6672. Thus, Cabot was legally responsible for Rolair's failure to pay employment taxes for 1984.

## 2. Willfulness

Although willfulness is usually a question of fact, "[e]vidence that the responsible person had knowledge of payments to other creditors, *including employees,* after he was aware of the failure to pay over withholding taxes is proof of willfulness as a matter of law." *Honey v. United States,* 963 F.2d 1083, 1087 (8th Cir.1992) (emphasis added), *cert. denied* 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992). It is undisputed that by early December 1984, Cabot knew that Rolair's payroll taxes were not being paid over to the IRS. Nevertheless, when Cabot invested additional funds into Rolair in December 1984 he instructed Curtis to pay Rolair's legal bills, its rent, and payroll. Hence, Cabot made a deliberate choice to pay other creditors over the IRS.

Additionally, Cabot, on the advice of counsel, insisted that all receivables be put towards the City Commerce Bank loan which he had personally guaranteed. Plaintiffs contend that the receivables were encumbered because the bank had a first lien on the receivables. Plaintiffs bear the burden of proving that the receivables were encumbered and that the banks interest in the receivables was indeed superior to the interest of the IRS. *Honey,* 963 F.2d at 1087. Plaintiffs rely on Cabot's testimony that "the bank seized the accounts receivable," and MacIntosh's belief that "[a]ll of Rolair's accounts receivable were pledged to a bank in Santa Barbara as security for a loan in Cabot's name." However, there is no evidence from Rolair's bank establishing that receipts from Rolair's receivables had to be paid to the bank or that the bank took that position. Accordingly, the court concludes that Cabot knowingly and voluntarily paid other creditors and expenses of Rolair while Rolair's payroll tax liabilities were accruing during the periods in issue. Thus, he willfully failed to pay payroll taxes that were due.

Furthermore, the court finds that under the circumstances, Cabot knew or should have known of the risk that payroll taxes were not being paid. Rolair had been in dire financial straits throughout Cabot's involvement with the company. Indeed, in

December 1983, Cabot had to infuse additional money into Rolair so that Baker could pay the payroll taxes. Babic testified that he frequently asked Quinn to ask Cabot to infuse more money into Rolair. Thus, Cabot was aware of Rolair's cash flow problem and understood the ramifications of that financial crisis on the company's ability to pay its creditors and the IRS. Moreover, under Cabot's direction, the financial and administrative functions were being transferred from Rolair to Southworth because Babic was becoming overwhelmed by the financial and managerial duties of Rolair. Cabot must have been aware of the risk that payroll taxes might not be paid to the IRS.

**Quinn**

Quinn's role at Rolair during the periods in issue was not as significant as Cabot's. Quinn was not an officer, director or employee of Rolair. Quinn's role, according to Cabot, was to be a friend and advisor to Babic. The record belies Cabot's characterization of Quinn's role and shows that Quinn was more than simply a friend and advisor. Quinn was Cabot's "eyes and ears" at Rolair. As previously discussed, the periods in issue involved the merger of Allied into Rolair, and the transferring of Rolair's financial and managerial functions to Southworth, eventually to be under the umbrella of Lepica. Cabot was well aware of Babic's limitations with financial and management functions, therefore he asked Quinn to help steer Rolair until the transition was completed. Quinn's duties were primarily to oversee the operations and manufacturing aspects of the transfer of Rolair to Southworth. Bisson, as Southworth's chief financial officer, was more closely involved with the transfer of Rolair's financial matters. During the periods in issue, Quinn reported to Cabot on the status of the transition. Although Quinn did not have an official title or position at Rolair, the fact that he was involved with Rolair at Cabot's request, and that he was eventually to be the president of Lepica, gave him significant status at Rolair. Indeed, in early May 1984, Quinn advised Rolair's employees that a holding company was being formed and that he would be in charge of it. Both Babic and Curtis testified that from early May 1984, they considered Quinn their supervisor. Babic frequently sought and followed Quinn's advice. If Rolair needed more money, Babic went to Quinn, not directly to Cabot.

While the court finds that Quinn's status at Rolair was significant, it cannot reach the same conclusion with regard to his duties and authority. Quinn spent "a lot of time" with Babic discussing matters relating to distribution of sales and matters relating to the manufacturing systems. Additionally, they discussed organizational techniques, ways of cutting costs, and ways of meeting Rolair's payables. The evidence, however, preponderates in favor of a finding that Quinn's duty and authority were marginalized by Cabot's dominance of Rolair. Quinn did not own any shares of Rolair stock, he was neither an officer or a director of the company. Quinn was an advisor to Cabot, and while he may have offered suggestions to Cabot with respect to Rolair, he did not make decisions with respect to Rolair's corporate strategy. The ultimate decisions were made by Cabot. In sum, Quinn did not have the power to control the decision-making power by which Rolair allocated funds to other creditors in preference to its withholding tax obligations. Because Quinn was not a responsible person, the court need not address the issue of his willfulness.

**CONCLUSION**

Based on the foregoing, the court holds that: (1) plaintiffs have failed to prove by a preponderance of the evidence that Cabot was not a responsible person under I.R.C. § 6672; (2) plaintiffs have failed to prove by a preponderance of the evidence that Cabot was not willful in his failure to pay the payroll taxes of Rolair. Thus, plaintiffs have failed to rebut the presumed correctness of the Commissioner's determination with respect to plaintiff Cabot; (3) plaintiffs have successfully met their burden of demonstrating that it is more likely than not that Quinn was not a responsible person under I.R.C. § 6672 during the periods in issue. In other words, the court finds that the Commissioner's determination that Quinn was a responsible person was in error.

700

Plaintiffs are, therefore, entitled to judgment with respect to plaintiff Quinn for the periods in issue. But, defendant is entitled to judgment for the balance of the penalty due from plaintiff Cabot for the periods in issue ... the parties shall confer and file, on or before November 3, 1997, a joint stipulation as to the amount of the foregoing judgments. No costs.