Mary L. MICHAUD

v.

The UNITED STATES.

James E. MICHAUD

v.

The UNITED STATES.

Nos. 92–822T, 92–823T.

United States Court of Federal Claims.

Nov. 26, 1997.

F. Patrick Matthews, Milwaukee, WI, with whom was Alan R. Bembenek for plaintiffs.

Benjamin C. King, Jr., Washington, DC, with whom was Asst. Atty. Gen. Loretta C. Argrett, for defendant. Terry T. Coles, of counsel.

## OPINION

YOCK, Judge.

These consolidated tax refund cases are before the Court for decision after a trial on the merits, held in Milwaukee, Wisconsin, and in Washington, D.C. The plaintiffs seek recovery of payments that each remitted to the Internal Revenue Service ("IRS") as partial payment of a 100 percent tax penalty assessed by the IRS against each of the plaintiffs pursuant to 26 U.S.C. ("I.R.C.") § 6672 (1994). The defendant has counterclaimed for the unpaid balance of the penalty assessed against each plaintiff in these consolidated cases. The assessed penalties represent an administrative determination that each plaintiff was a responsible officer of the corporate taxpayer and was required, and willfully failed, to pay over to the IRS federal income taxes and social security taxes that had been withheld from the wages of employees of Superior Engineering, Inc. ("Superior"), during the period of October 1, 1985, through September 30, 1987.

For the reasons that follow, both plaintiffs prevail in these refund actions.

*Statement of Facts*

The facts of this case revolve around one central figure, Mr. Robert Pasternak, Superior's founder, president, and treasurer. A large, imposing man with an intimidating demeanor and explosive personality, Mr. Pasternak systematically misled and exploited people in order to maintain an iron grip on the reins of Superior. Through his control of the company, he orchestrated and concealed a tax evasion scheme by which he diverted to his own benefit funds that had been withheld from employees' wages for the payment of federal taxes. Mr. Pasternak illegally tapped this source of supplemental income in order to maintain an opulent lifestyle, build an extravagant house, and buy high-ticket items such as a Corvette, a Cadillac, a Buick Riviera, a Chevrolet Blazer, and a speed boat.

Some sophisticated business associates with perceptive advisors eventually discerned Mr. Pasternak's mismanagement of Superior and were able to cut their ties with Superior early, thus minimizing their losses. Most of the people with whom Mr. Pasternak chose to associate, however, including the plaintiffs in this case, did not have the educational background, personal experience, or business acumen to realize the extent of his deceptive business practices.

Mr. Pasternak's misdeeds eventually were exposed to all of those who knew and worked with him. It came to light that he was a bigamist who had falsified legal divorce papers and church annulment papers in order to marry his current wife. He allegedly stole office furniture from a former employer. He diverted corporate funds to his wife's business as well as to his own pocket. He used false credentials on his resumé to secure employment. He did not file his own personal income tax returns for over a decade. In 1989, Mr. Pasternak's dishonesty finally caught up with him, and he became a defendant in criminal proceedings arising out of his willful failure to remit both his own and Superior's taxes. He pled guilty to two felony counts, one for evading taxes on his 1985 income and one for evading Superior's payment of $118,471.13 of employment taxes for the second quarter of 1986. He was sen-

tenced to four years in a federal prison. Mr. Pasternak is now out of incarceration and working in a new business, while James and Mary Michaud still are sorting through the mess that he left behind.

The story of how James and Mary Michaud unwittingly became embroiled in the instant cases begins in 1978. In that year, Mr. Pasternak was hired by IDI Corporation ("IDI"), an established company with multiple offices in Wisconsin. IDI provided temporary engineering services, on a contract basis, to major corporations with a temporary need for draftsmen and engineers. Mr. Pasternak was hired as part of the temporary technical staff. The credentials on his resumé were impressive, including a degree in mechanical engineering from Purdue University and a degree in tool engineering from Chicago Technical College. In fact, Mr. Pasternak never received either degree. This deception was only the first in a long series of lies and misrepresentations by Mr. Pasternak that eventually ensnared the Michauds in the current tax litigation.

Mr. Pasternak greatly desired a more active role in sales and management, and, in 1982, IDI offered the outgoing and gregarious businessman a position of general supervision at its Green Bay office. The promotion offer included a stipulation, however, and Mr. Pasternak's refusal to comply with that stipulation vividly depicts his historical aversion to paying taxes. From 1978 through 1982, Mr. Pasternak was classified by IDI as an independent contractor. As a result, IDI did not withhold employee payroll taxes from his wages. In addition, Mr. Pasternak did not file his personal annual income tax returns and thus evaded the remittance of any income taxes and social security taxes to the Federal Government. As a requirement of the promotion, however, IDI insisted that Mr. Pasternak sign a governmental form W-4, which would authorize the company to withhold his payroll taxes and to remit them to the Federal Government. He adamantly refused to sign the W-4 form.

Confronted with Mr. Pasternak's refusal, IDI set a deadline of March 1, 1983, for acceptance of the promotion offer. However, rather than comply with IDI's stipulation to have his payroll taxes withheld by IDI, and, thereby potentially alert the Government to his historic tax evasion, Mr. Pasternak resigned from IDI on the deadline date.

Mr. Pasternak then incorporated his own business, Superior Engineering Services, Inc. ("Superior Services"),[1] which competed against IDI and, at least temporarily, allowed him to continue his tax evasion scheme. Similar to IDI, Superior Services provided temporary engineering services to industries located in Wisconsin. Mr. Pasternak retained a minority ownership interest in the entity; he secured the majority of the capitalization for the new entity from the contributions of a local Green Bay company, Bay Industrial Machine, Inc. ("Bay Industrial").

While working at IDI, Mr. Pasternak met Mary Meyer ("Mary"),[2] who had worked as a receptionist/secretary for IDI since 1976. Prior to joining IDI, Mary had held a variety of entry-level jobs, including sales clerk, nurse's aide, dental assistant, and receptionist in an optometrist's office. This rudimentary employment background provided Mary with only limited experience to perform routine secretarial tasks at IDI. When Mr. Pasternak left IDI in 1983, he convinced Mary to leave IDI and to join him as his office secretary/receptionist.

Mr. Pasternak also entreated Mary to convince her fiancé, Mr. James Michaud ("Jim"), to join the company as Superior Services' salesman. At that time, Jim was working for a local company that marketed individual retirement account packages to credit union members. Previously, Jim had held jobs as a bar manager and a residential real estate agent, but he had no education or experience in handling financial, accounting, or business tax matters.

Jim and Mary were not named as directors or officers of Superior Services. They were the only permanent employees of the compa-

---

1. "Superior Services" is the predecessor company to "Superior," the company that is involved in these cases.

2. The plaintiff's name, prior to her marriage to James Michaud, was Mary Meyer.

ny, and their duties seem to have been clearly delineated. Jim was responsible for selling and marketing the company's services throughout Wisconsin and, consequently, often was out of the office performing those functions. As she had at IDI, Mary worked as a receptionist/secretary. In addition to various secretarial and receptionist duties, she was assigned some basic bookkeeping tasks, including work on the payroll system. The payroll duties involved referring to a chart to determine amounts to be withheld from the employees' wages for income taxes and social security taxes and entering those figures into the corporation's books.[3] At the request of the company's outside accountants, Mary would forward the raw data so that the accounting firm could prepare payroll tax reports for Mr. Pasternak, the company's president. She also prepared payroll checks for the president's signature.

Apart from Mary's purely clerical payroll functions, Mr. Pasternak was in complete control of the company's taxes. His exclusive dominion over tax matters was guaranteed by his strict policy that all mail from the Government was to be placed unopened on his desk, ensuring that no employee at Superior Services would become privy to IRS inquiries.

From the beginning of Superior Services' existence, Mr. Pasternak had legal troubles. According to legal papers filed in a lawsuit by IDI, he stole customer records, contact lists, and staff from IDI. He allegedly competed directly against IDI in violation of an oral covenant not to compete. Additionally, Mr. Pasternak allegedly took from IDI equipment and furniture, which were altered in order to conceal the identity of the rightful owner. IDI eventually recovered its property and dropped its lawsuit. However, another problem began to plague Mr. Pasternak and his company.

Bay Industrial increasingly became skeptical of Mr. Pasternak's management of Superior Services. Within a few months of the company's incorporation, Bay Industrial's outside accountant, Mr. James Graven of Herman & Graves, discerned that Mr. Pasternak was not meeting the company's employment tax obligations and that he might be engaging in deceptive business practices. Largely as a result of Mr. Graven's observations, the professionals advising the principals of Bay Industrial strongly recommended that Bay Industrial end its relationship with Mr. Pasternak and salvage what it could out of its investment in Superior Services. Bay Industrial heeded this advice and terminated its investment in Superior Services.

Mr. Pasternak did not reveal to his employees the underlying reason for Bay Industrial's withdrawal. Rather, he portrayed himself as Jim and Mary's friend, and told the Michauds that he parted with Bay Industrial because the investor wanted to cut Mary's wages and greatly expand Jim's sales duties.

After Bay Industrial terminated its investment in Superior Services, Mr. Pasternak needed a new vehicle to drive his business aspirations and tax evasion scheme. In October 1983, he engaged an attorney, Mr. Adrian T. Ulatowski, to incorporate a successor business—Superior Engineering, Inc. ("Superior").[4] In order to retain his employees, Mr. Pasternak invited Jim and Mary to purchase a joint, twenty-five percent interest in Superior for $10,000. Apparently, he felt that Mary had been a capable secretary and that Jim had been a formidable salesman, although he may have appreciated their lack of business sophistication more than their

---

3. Mary was not capable of properly maintaining the company's records. Mr. Pasternak eventually had to hire various professionally trained people to assist her with her bookkeeping duties as well as to review the records.

4. According to its corporate minute book, the company formally was organized as SES, Inc. on December 31, 1983, and changed its name to Superior Engineering, Inc. ("Superior") in June 1984. Because investor Mr. Richard R. Schutte was a registered professional engineer in the state of Pennsylvania and, in the spring of 1984, obtained a Wisconsin license by reciprocity, Mr. Pasternak was able to use the word "Engineering" in the company's name. Previously, he had been able to utilize the term "Engineering" in Superior Engineering Services because of Bay Industrial's involvement. In the temporary engineering services industry, the ability to have "Engineering" in the company's name is a valuable marketing tool.

qualifications. Because the Michauds did not have $10,000 to invest in Superior, Mr. Pasternak permitted their capital contributions to be funded by their payments for office equipment and by booked, but unpaid wages. In addition to the Michauds, Mr. Pasternak, Mr. Karl Kuntz (a draftsman who had previously worked with Mr. Pasternak and was his close friend), and Mr. Richard R. "Rex" Schutte[5] (an out-of-state engineer whose license to practice Mr. Pasternak would use to market the company), each purchased a twenty-five percent interest in the newly-formed company.

At the initial organizational meeting, Mr. Ulatowski reviewed the obligations of corporate officers. With respect to the position of treasurer, he emphasized that the treasurer, in certain circumstances, could be held personally responsible for the debts of the corporation. Mr. Schutte, the only shareholder with a financial background, was eliminated from consideration for the treasurer's position because he lived out of state. Mr. Pasternak announced that, because he had more experience than the rest of them in handling corporate money, he would assume the treasurer's role in addition to his position as corporate president. Jim and Mary Michaud did not object to this rationale, because aside from consistently filing their own personal income tax returns, neither had financial, accounting, or business tax experience. Thus, in addition to obtaining overall responsibility for the operation of Superior, Mr. Pasternak quickly assumed the responsibility for all matters related to the payment of Superior's taxes. As president and treasurer, he was firmly in control of the finances of the newly-formed Superior.[6]

As to the other officer and director positions, Mr. Schutte and Mr. Kuntz immediately were eliminated from consideration, each preferring to remain a mere minority shareholder. Apparently by necessity, Jim and Mary Michaud were chosen to fill the remaining officer vacancies. Largely as a result of the selection of his coinvestors, therefore, Mr. Pasternak ensured that the three directors of Superior would be himself, Mary and Jim, and that they would hold the following offices:

President/Treasurer: Robert W. Pasternak
Vice President: James E. Michaud
Secretary: Mary L. Michaud

Despite their new titles, the Michauds' duties did not change in any material respect from what they had been at Superior Services. Under the corporate bylaws, Jim, as vice president, was responsible for carrying out all of the duties of the president in his absence. The president, however, was never absent. Even when Mr. Pasternak worked at sites away from the Superior corporate office, he still stopped by the office daily to direct all of the company's operations. In addition, Jim did not perform any of the various duties a vice president would be expected to perform. For example, he did not negotiate with banks, have access to corporate funds, or authorize employee raises. Jim, undoubtedly to Mr. Pasternak's delight, did not have any background, training, or experience in reviewing or analyzing corporate financial statements, so he could not knowledgeably scrutinize them. As far as he and the others who testified at trial were concerned, Jim was the marketing director, and, as long as he was bringing in business, he was performing his duties properly.

Although entitled Superior's corporate "secretary," Mary was at most Superior's office manager. She was responsible for the smooth operation of the corporation's office and for all of Superior's administrative matters. Her designation as "secretary" was more a matter of form and convenience than an increase in the level of her responsibilities. She did not prepare the corporate minutes, maintain the corporate minute book, negotiate with lenders, prepare certificates of

---

5. Mr. Schutte also was a professor of advanced business practice at Widener University in Delaware. Mr. Pasternak was able to conceal the payroll tax problem even from him, despite Mr. Schutte's extensive background in business and financial matters.

6. Mr. Pasternak instructed Mary to classify him as an independent contractor for payroll purposes, even though Mr. Ulatowski had advised him that he should not be so classified. Consequently, he was able to continue his scheme of having no employee payroll taxes withheld from his pay while also failing to remit annual personal income tax returns.

deposit, select financial institutions, deal with federal or state authorities or prepare any federal or state tax returns.

As the company expanded, Mary assumed a greater role in the payment of creditors. In Superior's early days, she and the other office personnel prepared company checks only at the president's express instruction and delivered them to him for his signature. Eventually, the company outgrew this impractical micromanagement of minor expenditures. Primarily for Mr. Pasternak's convenience, Mary became a bank signatory sometime in 1984.[7] Mary's check-signing function, however, was purely ministerial; Mr. Pasternak had to authorize expenditures before Mary could sign checks to cover them. Despite Mary's signature authority, the president still determined which bills were to be paid and when.

Mary also performed the same payroll functions that she had at Superior Services. She was responsible for ensuring that employees received their paychecks on time. She used tables published by the IRS to determine payroll tax amounts to be withheld from the employees' wages and entered those figures in the corporate books. Apart from these clerical and mechanical administrative actions, however, Mary was not involved with matters related to Superior's employment taxes.

The trial exhibits and credible testimony reveal that Mary understood very little about the payroll tax system. Although Mary had a high school diploma, she did not have any formal training in accounting or finance. Her grades in college, as evidenced by her transcript, were poor. Mr. James Graven, the outside accountant for Bay Industrial, testified that accounting and finance came very slowly to Mary and that she never fully understood the importance of the corporation's accounts and records. During Superior Services' brief existence, Mr. Graven

spent an inordinate amount of time instructing her as to the basics of simple accounting. Compounding Mary's financial ignorance, Mr. Pasternak immediately and forcefully took charge of all inquiries regarding payroll taxes, consistently reassuring Mary and others that he was "taking care of it."

Mr. Pasternak eagerly assumed responsibility for all of Superior's taxes and other financial matters. He continued his policy of receiving, unopened, all governmental correspondence, and the plaintiffs' exhibits and credible witness testimony revealed that Mr. Pasternak was the only person responsible for the filing and payment of corporate taxes. He micromanaged Superior's finances so extensively that he selected and decided which bills Mary was to pay, including relatively minor expenses such as the telephone bill. In his position of nearly monopolistic control, Mr. Pasternak also ran roughshod over ethical business behavior. As examples of his questionable business practices, he maintained several bank accounts for himself, used Superior's funds for his wife's beauty shop,[8] and invested Superior's money in a friend's used car lot.

In addition to his stranglehold on corporate finances, Mr. Pasternak was able to carry out and conceal his withholding tax diversion scheme through deception. For example, when Mr. Schutte inquired at the 1987 shareholder meeting about Superior's tax obligations, Mr. Pasternak untruthfully related that, although the company was behind in its taxes, a deal had been made with the tax authorities to stay current while working down the arrearage. When questioned about the lack of detailed corporate financial information at the same meeting, he asserted that lightning had struck the company's computer, destroying all of the 1986 financial data.

According to Mr. Pasternak's reports at the annual shareholder meetings, Superior

---

**7.** Jim was never a signatory on any Superior bank account.

**8.** Mr. Pasternak's lack of integrity extended to his personal life. His current wife, Donna, supposedly was married to him at the time of the aforementioned events, but the marriage was not legal due to Mr. Pasternak's existing marriage to

another woman. In order to marry Donna, Mr. Pasternak forged divorce papers, lied on official marriage documents, and falsely represented to the Catholic church and the state of Wisconsin that his first marriage had been annulled. At some later point in time, Mr. Pasternak obtained a legal divorce and married Donna.

prospered under his leadership, always increasing its staff and gross revenue.[9] He reported at the August 1984 annual corporate meeting that the company had thirty employees and gross receipts for the prior year of $192,000. He attributed the $30,000 loss reported on the corporate income tax return for 1983 to normal start-up costs. At the next annual corporate meeting in 1985, Mr. Pasternak reported that Superior had increased to forty-five employees and that its gross receipts for 1984 totaled $1,180,000. The company again had experienced a loss, in the amount of $31,000, but Mr. Pasternak dismissed it as insignificant. At the annual corporate meeting held in 1986, the president did not mention the number of corporate employees, but reported that the gross revenue for 1985 had been $2,500,000. The company's net loss of $100,000 vaguely was attributed to the expansion of in-house services and the use of current earnings to sustain growth. Mr. Pasternak continued to paint a rosy picture of Superior's future and optimistically forecasted revenue from a new Nashville, Tennessee, office and a new venture in the design and manufacture of machines for the paper industry. At the last annual meeting on October 9, 1987, Mr. Pasternak accurately reported the 1986 gross revenue of $1,887,000, but he did not reveal that the company also showed a loss of $691,-000 on its tax returns.[10]

On top of this pattern of deception, Mr. Pasternak effectively controlled Superior through intimidation, frequently ranting, raving, and cursing at his office staff. His intimidating manner minimized or eliminated employee questions concerning his management of Superior. In short, he was a successful con artist who subsidized his own income with the taxes withheld from his corporation's employees. He could not be approached easily with questions, and anyone who had the courage to challenge him was effectively deceived.

Throughout Superior's four years of existence, the four investors other than Mr. Pasternak were never able to discern that a major tax problem existed. Mr. Kuntz, alternately described by the plaintiffs as Mr. Pasternak's lackey and by the Government as a disinterested investor, never questioned Mr. Pasternak's representations about Superior. Mr. Schutte taught an advanced business course at a university and had a substantive business background, yet he too was convinced by the company president that Superior was doing well. Given their lack of business sophistication, Jim and Mary Michaud had little reason to suspect that something was greatly amiss at Superior. Certainly, they did not have any reason to believe that Mr. Pasternak was undertaking the largest employment tax swindle in Wisconsin's history.

Jim, who had little understanding of or experience with financial statements, had been successful at increasing the amount of Superior's business. His infrequent, cursory reviews of the records revealed increasing gross revenues. He reasonably concluded from his understanding of finances that, as long as Superior continued to increase its business, it would be successful. Mary equated Superior's success with its ability to pay its bills and to meet its payroll. Although she consistently struggled with the limited bookkeeping tasks assigned to her, she always met her first priority, which was paying the employees. Mary reasonably concluded from her understanding of finances that, as long as the employees and bills were being paid, Superior must be doing all right.

Although Mr. Pasternak's coinvestors were oblivious to Superior's tax deficiency, it ap-

---

9. At these informal gatherings, Mr. Pasternak conducted short, sketchy, and often inaccurate summaries on general topics, but he never provided Superior's corporate tax returns or its financial statements. For example, the 1984 corporate income tax returns reflected gross revenue of $1,026,361, substantially less than the $1,180,000 he reported at the 1985 corporate meeting. Likewise, Superior's corporate tax returns for 1985 reflected $300,000 less than the amount reported to the shareholders at the 1986 corporate meeting.

10. Characteristically, Mr. Pasternak never addressed the burgeoning employment tax deficiencies at any of these annual meetings. When a hint of inquiry into the matter arose, he nonchalantly stated that the computer was generating incorrect data and that Superior's tax issues were under control.

pears that the problem did not escape the eyes of the company's accountants. Because Mr. Graven's association with Mr. Pasternak ended when Bay Industrial withdrew its investment from Superior Services, Mr. Pasternak was required to find a new outside accountant for Superior. He selected Mr. Terry Anderson of Jonet, Fountain, Vande-Loo & Glaser.[11] As Mr. James Graven previously had done, Mr. Anderson attempted to assist Mary in her basic bookkeeping duties. He also helped her set up the company's accounting system and select computer hardware and software. In addition, Mr. Anderson prepared Superior's federal and state tax returns. These returns reflected Superior's unpaid employment tax liabilities and were always sent directly to Mr. Pasternak. It appears that the outside accountant spoke only to Mr. Pasternak about the ever-increasing employment tax liabilities. After consulting with Mr. Anderson, the president would decide whether or not to file the federal and state payroll tax returns.

As Superior grew, it became apparent to both Superior's president and the outside accountant that an on-site accountant was necessary. Mary simply was incapable of understanding and performing the record keeping and reporting required for Superior's expanding business. In the summer of 1985, Mr. Anderson recommended Mr. Tony Brice for the newly-created on-site accounting position. Mary knew Mr. Brice and his family and felt comfortable working with him, so Mr. Pasternak hired him.[12]

Mr. Brice was a recent accounting graduate, who, during the trial, displayed a remarkably high level of confidence in himself, which was matched by his level of bitterness toward Superior's officers. From the date of his hiring until his resignation in August 1987, he made accounting entries and reconciled bank accounts. In 1986, he became a bank signatory, capable of ministerially signing checks for expenses that first had been authorized by the company president. Mr.

Brice testified that he identified the payroll tax problem within the first week of his employment, but curiously he never directly addressed the issue with Mary, Jim, or even Mr. Schutte, despite Mr. Schutte's requests for financial information. Mr. Brice subscribed to the theory that since he, a novice accountant and a new employee, saw a problem with the employment taxes, the discrepancy must have been "blatantly obvious" to everyone else. Consequently, he failed to pursue the payroll tax issue with Mary, Jim or Mr. Schutte.

A year and a half after he began working at Superior, Mr. Brice finally confronted Mr. Pasternak about the nonpayment of payroll taxes. He admonished Mr. Pasternak for "screwing people out of their social security earnings and they don't even know it." (Tr. at 860.) By then, however, Mr. Brice was disillusioned with his first accounting job. He fell behind in his work and began actively searching for another job. Increasingly paranoid about the situation at Superior, he even perceived a $5,000 bonus as hush money. He equated working at Superior with being in the Mafia and, thus, felt it best just to follow orders and not to ask questions. Frustrated and embittered, he finally resigned from the company on August 6, 1987. For the remaining four and a half months of Superior's existence, First Wisconsin Bank performed Superior's accounting and payroll functions.

Contrary to Mr. Brice's claims that an ongoing employment tax problem was immediately obvious and that the payroll taxes had not been paid by Superior in years, the company apparently met its employment tax obligations for 1984 and the first half of 1985. But in late 1985, around the time that Mr. Brice became the on-site accountant, the IRS began billing Superior for modest amounts that Mr. Pasternak falsely claimed had been paid. The president's method of response was to scribble cryptic notes on the IRS bills and send them back to the Kansas City Service Center. Mr. Pasternak's method of

---

11. Mr. Anderson was not called to testify at trial in part due to the fact that he is serving a prison sentence for defrauding his accounting firm's clients.

12. The credible testimony of witnesses indicated that, while Mary may have had input into Mr. Pasternak's hiring decisions regarding low-level administrative employees, Mr. Pasternak was Superior's ultimate hiring and firing authority.

dealing with Superior's taxes increasingly became harried, delinquent, and secretive. For example, he periodically would scoop up the company's financial records and leave the company premises, stating either that he was going to see the IRS to get the tax problems straightened out[13] or that he was going home where he could work on these matters without interruption. As a result of his control over all governmental correspondence, no one but Mr. Pasternak received any information describing Superior's tax problems, and, thus, with the exception of Mr. Anderson and possibly Mr. Brice, no one but Superior's president had any idea of the magnitude of the company's tax difficulties.

Mr. Pasternak had absolute control over the company's tax matters and kept the Michauds uninformed. He handled IRS inquiries secretly and consistently assured the Michauds and others that he was taking care of the company's taxes. Revenues were on the increase, employees were being paid, and Jim and Mary lacked tax and financial knowledge, so neither of the Michauds had any grounds for doubting the president's assurances. Some corporate financial documents may have existed that described the tax deficiencies, but Jim, as a traveling salesman, rarely was in a position to review these records. His notable lack of financial experience would limit his understanding of such reports, even if he had perused them. Mary inputted the data used to generate many of these documents. But as an office manager with no financial, accounting or tax background, she apparently could not understand what the numbers on these documents represented. Additionally, she constantly had difficulty interfacing with the computer; combined with Mr. Pasternak's assertions that the computer reports were all wrong, it would have been reasonable for her to dismiss the accuracy of the figures, even if she could have comprehended what they described.

By controlling Superior's financial matters and surrounding himself with naive and/or disinterested investors, directors, officers, and employees, Mr. Pasternak was able to operate his tax evasion scheme successfully from Superior's inception in 1983 through the first quarter of 1987. Soon thereafter, however, the sun rapidly began to set on the president's source of supplemental income.

On April 14, 1987, Mr. George Semenak and Mr. Dan Wijas, both employees of Superior, visited the local office of the IRS.[14] Earlier that day, they had discovered that the Social Security Administration did not have documentation of Superior's payroll tax contributions to their accounts. As a result of this visit, the IRS launched an investigation of Superior.

Other employees apparently checked on the status of their payroll tax contributions as well. In September 1987, a company receptionist notified Mr. Pasternak that a former employee was on the telephone inquiring into deficiencies in contributions to his personal social security account. In keeping with his untruthful character, Mr. Pasternak instructed the receptionist to tell the caller that a deal had been concluded with the IRS and that the company would pay its arrearage.

Having been put on notice that employees were getting wise to his scheme, Mr. Pasternak visited Superior's corporate attorney, Mr. Ulatowski, shortly after Labor Day in 1987. He confided that he had not been paying Superior's employment taxes and that nobody else knew about Superior's tax delinquency. Mr. Ulatowski, who is not a tax attorney, referred him to Mr. Robert Dallman, a lawyer with expertise in tax matters. Mr. Pasternak met with Mr. Dallman on September 11, 1987. Mr. Pasternak continued to keep this meeting and the tax problems concealed from the company's other officers, directors, employees, and shareholders, as evidenced by his failure to address

---

13. Contrary to these assurances, Mr. Pasternak never met with the IRS to resolve the increasingly delinquent employment tax situation.

14. At first, both employees refused to reveal to the IRS agent where they worked. Mr. Semenak testified that he and his coworker, Mr. Wijas, greatly enjoyed Superior and their fellow employees. Like Jim and Mary, he had not suspected that anything was amiss at Superior, and he was shocked to learn of Mr. Pasternak's diversion of funds intended for the payment of payroll taxes.

the issue at Superior's final shareholder meeting on October 7, 1987.

On October 22, 1987, Mr. Pasternak learned that Superior was under an IRS investigation. Mr. Jim Hill, a special agent with the IRS Criminal Investigations Division, personally served a summons on Superior, requesting all of its corporate books and records.[15] On the advice of Mr. Dallman, all of Superior's books and records eventually were taken to Mr. Dallman's office, where they remained for at least the next two months.

Later that day, Mr. Pasternak told Mary that the company owed a large amount of back taxes and that he accepted responsibility for failing to remit the funds to the IRS. Mr. Pasternak attempted to diminish the gravity of the situation by explaining to Mary that the entire matter was now in the hands of the attorneys. Apparently realizing that the end of his reign at Superior was near and that he would no longer be able to drain it of cash, Mr. Pasternak began to disintegrate emotionally. Nevertheless, he immediately took several steps to maximize his financial position and to minimize his exposure to creditors. For example, on October 23, 1987, he mortgaged his house to the limit. He also wrote himself checks on the company's used car business.

Jim was out of town on the day that the IRS appeared at Superior. Mr. Pasternak informed Jim of Superior's tax problems about a week later. On that day, either October 26 or 27, 1987, Mr. Pasternak briefly was hospitalized for chest pains and began treatment for depression. The next week, on November 3, 1987, Mr. Pasternak, Mr. Kuntz, and the Michauds took the remaining company records to Mr. Dallman's office. Although furious with Mr. Pasternak and concerned about Superior's future, Jim and Mary were under the impression that the situation had stabilized as a result of the hiring of Mr. Dallman, who, they were led to

believe, could rectify Superior's tax problem. They continued working in order to keep Superior running as smoothly as possible under the circumstances. On November 23, 1987, however, Mr. Dallman informed the Michauds that he would represent only Mr. Pasternak, not Superior or either of them individually.[16]

At this point, Jim became convinced that the tax problem, whatever its nature, was serious. He also knew from Mr. Pasternak's admissions that Superior's tax problems were caused by the president and that he would have to maneuver around Mr. Pasternak if the company was to survive. Because all of the corporate records were now in the hands of Mr. Pasternak's attorney, however, Jim was unable to determine how best to proceed.

The following week, Mr. Schutte flew in from Pennsylvania to join Jim in confronting Mr. Pasternak. As the company president rarely appeared at the office after Special Agent Jim Hill's visit at the end of October, Jim and Mr. Schutte confronted Mr. Pasternak at his house on Tuesday, December 1, 1987. In an apparent effort to appease his infuriated coinvestors, Mr. Pasternak called Mr. Dallman, who explained to Mr. Schutte and Jim over the telephone the seriousness of Superior's tax problem. Mr. Pasternak, once again, voluntarily admitted that he was solely responsible for the substantial tax liability. Mr. Dallman advised the shareholders that they had two legal options concerning Superior: (1) close its doors and turn over to the IRS assets of little value, or (2) effect a sale at the best possible price and assign all of the proceeds to the IRS. The shareholders chose the latter option.

At this point, Jim Michaud's disgust with the president's illegal activities and his desire to make the best of a bad situation motivated him to assume responsibility for effecting the sale recommended by Mr. Pasternak's attor-

---

15. Mr. Hill, who played a large role in the investigations of Superior, Mr. Pasternak, and the Michauds, unfortunately passed away before the trial.

16. Although Mr. Dallman expressed concern that Mary might be subject to IRS scrutiny as a result of her check-writing authority, Mr. Pasternak assured the group that Mary had not been involved in his diversion of the trust fund account and that he alone was responsible for the entire payroll tax diversion.

ney. Jim and Mary continued to keep Superior operating by paying its creditors and employees. Importantly, the Michauds ensured that Superior paid its November and December 1987 federal and state payroll taxes. Jim obtained independent appraisals of the company's tangible assets, and the only other available asset, its accounts receivables. He tracked down one of Superior's certificates of deposit, which was in the possession of Mr. Pasternak's wife, had it signed over to him and deposited it to the company's benefit. He went to the used car lot in Menominee, Michigan, in which Mr. Pasternak had invested the company's money, recovered $3000, and deposited it into a company bank account. In short, Jim did all he reasonably could, under the circumstances and with his limited financial experience, to undertake the option recommended by Mr. Dallman.

Finding a purchaser for Superior, under these conditions, proved to be difficult. Testimony at trial from competitors and business valuation experts depicted Superior as an extremely unattractive purchase. The Michauds considered their limited options and then discovered that Jim's father and brother were willing to form a new corporation, SRG, to take over Superior's business and limited assets. They did not, however, meet with the IRS to work out a payment plan or to seek its approval of their course of action. In the proposed new corporation, Jim and Mary would continue to perform similar jobs, only now as employees of SRG, and would make comparable salaries. All of the proceeds from the sale of Superior to SRG would be assigned to the IRS, so the five shareholders would lose their individual investments in the company.

Mr. Schutte agreed with this plan, but Mr. Kuntz and Mr. Pasternak stubbornly and/or spitefully held out. Without the consent of either Mr. Kuntz or Mr. Pasternak, Superior could not transfer its assets to SRG.[17] Thus, Mr. Schutte and the Michauds acceded to Mr. Kuntz's plan whereby Superior redeemed Mr. Kuntz's stock on December 21, 1987, in return for the company's computer-

assisted design system. This redemption increased the combined proportionate stock ownership of Mr. Schutte and the Michauds to sixty-six percent. On the same day, Jim and Mary resigned their officer and director positions. Moments later, with a majority of shares approving the measure, Superior sold all of its assets to SRG, in spite of Mr. Pasternak's continued opposition to the plan.

The consideration given by the newly-formed SRG for Superior's assets was $10,000 cash and an unsecured promissory note for $216,000 which was assigned to the IRS. Prior to the sale, Superior's assets had a fair market value of approximately $216,000 and an apparent liquidation value of approximately $170,000. Since the asset sale in 1987, the buyer, SRG, has paid more than $220,000 to the IRS on the promissory note. With each payment, SRG has instructed the IRS to apply its payment first to the latest trust fund portion of the employment tax liability.

The Government eventually caught up with Mr. Pasternak and exacted a toll from the one person who masterminded and benefitted from the largest federal tax evasion case ever to occur in Wisconsin. In March 1989, Mr. Pasternak pled guilty to two felony counts, one for evading taxes on his 1985 personal income, and one for causing Superior to fail to pay $118,471.13 in employment taxes for the second quarter of 1986. In the plea agreement, Mr. Pasternak admitted to converting to his own personal use funds withheld from the wages of Superior's employees that were intended for the payment of payroll tax obligations. In addition to the criminal proceedings, the IRS assessed a 100 percent civil penalty against Mr. Pasternak in an effort to recoup the unpaid withholding taxes of Superior for the period from October 1985 through September 1987.

The repercussions of Mr. Pasternak's one-man tax swindle still resonate ten years after its discovery. Although the Government criminally and civilly penalized the person responsible for Superior's tax deficiency, the IRS also has assessed civil penalties against each of the Michauds. The IRS has made an

---

17. Under Wisconsin law in effect at that time, a sale of substantially all of a company's assets required the approval of a majority of the shares entitled to vote. *See* Wis. Stat. §§ 180.25(2)(b), 180.71(3) (1987).

administrative determination that Jim Michaud, as the vice president of Superior, and Mary Michaud, as the corporate secretary, both were officers responsible for ensuring that Superior's employment taxes were accounted for, collected, and paid over to the United States Government. Additionally, the IRS has determined that each of the Michauds willfully failed to collect and to pay over Superior's trust fund taxes for the last quarter of 1985, for all of 1986, and for the first three quarters of 1987. Pursuant to I.R.C. § 6672, the IRS has assessed a 100 percent penalty, in the amount of $880,440.88, against each of the Michauds.[18]

Mary Michaud remitted $5.72, and James Michaud remitted $40.04, to the IRS in response to the assessments. The amounts represent the FICA taxes withheld from the compensation of two Superior employees for the quarter ending on September 30, 1987. Upon disallowance by the IRS of their claims for refunds of these amounts, the Michauds filed the above-captioned refund suits. The Michauds do not dispute that Superior failed to pay its withholding taxes for the tax periods in question. They contend that they were not persons responsible for ensuring that Superior paid these trust fund taxes and, moreover, that they did not willfully fail to collect and to pay over such taxes. The defendant has filed a counterclaim against each of the Michauds seeking $879,320.16, the balance of the unpaid 100 percent penalty, on the basis that Jim and Mary Michaud each were responsible persons, required to collect and to pay over Superior's trust fund taxes to the Government and that they willfully failed to do so.

As stated above, SRG has sent payments to the IRS pursuant to the promissory note executed as part of the purchase of Superior's assets. The plaintiffs and the defendant have agreed in a joint stipulation to apply the SRG payments first to Superior's outstanding trust fund employment tax liability for the fourth quarter of 1987, a period not at issue in these cases. As of September 24, 1996, the balance of the SRG payments available to be applied to Superior's trust fund liability for the periods at issue was $181,552.10. The balance of Superior's liability, after crediting the SRG payments to its delinquency, is $698,888.78. The parties have agreed that, if the plaintiffs are found liable for the assessed 100 percent penalty, the maximum liability would be $698,888.78, plus interest from the date of the assessment.

## Discussion

Congress has imposed a duty on certain employers to collect from their employees federal income taxes and social security taxes. See I.R.C. §§ 3102(a) (requiring employers to collect social security taxes), 3402(a) (instructing employers to collect federal income taxes from employee wages) (1994). Employers meet these collection obligations by withholding appropriate amounts from their employees' wages each pay period. "The withheld sums are commonly referred to as 'trust fund taxes,' reflecting the [Tax] Code's provision that such withholdings or collections are deemed to be a 'special fund in trust for the United States.'" *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978) (citing I.R.C. § 7501(a)[19]). The trust fund taxes are to be remitted to the Government on a quarterly basis. See 26 C.F.R. §§ 31.6011(a)–1(a)(1), 31.6011(a)–4 (1997).

18. On July 9, 1990, the IRS assessed a 100 percent penalty pursuant to section 6672, in the amount of $266,916.81, for the tax periods ending March 31, 1987; June 30, 1987; and September 30, 1987. On April 16, 1996, the IRS assessed a 100 percent penalty in the amount of $613,524.07, for the tax periods ending December 31, 1985; March 31, 1986; June 30, 1986; September 30, 1986; and December 31, 1986. Although the assessments were made on each plaintiff individually, "the Government is entitled, through an assertion of 100–percent penalty assessments, only to one satisfaction of the payroll tax liability." *Gens v. United States*, 222 Ct.Cl. 407, 415, 615 F.2d 1335, 1339 (1980). The liability of each individual assessed, therefore, must be abated by the amount of Superior's tax delinquency collected from other sources.

19. I.R.C. § 7501(a) provides, in pertinent part, that "[w]henever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States."

"Because the Code requires the employer to collect taxes as wages are paid, § 3102(a), while requiring payment of such taxes only quarterly, the funds accumulated during the quarter can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Slodov*, 436 U.S. at 243, 98 S.Ct. at 1783. To deter the pilfering of trust fund taxes, Congress has authorized the IRS to use several means to effect payment of funds from delinquent employers. One method of effecting payment is by assessing a penalty equal to the amount of the delinquent taxes against particular individuals responsible for the employer's nonpayment. The relevant provision provides that:

> [a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

I.R.C. § 6672(a). For purposes of this provision, a "person" "includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." I.R.C. § 6671(b).

The IRS has determined that the plaintiffs in these cases are persons who are subject to the 100 percent penalty authorized by section 6672. In evaluating the plaintiffs' opposition to the Government's determination, it is noted that, as in all tax refund cases, the findings of the Commissioner of Internal Revenue are entitled to a presumption of correctness. *See United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7 (Fed. Cir.1990); *Whiteside v. United States*, 26 Cl.Ct. 564, 566 (1992). In order to succeed in their refund suits, the plaintiffs bear the burden of proving, by a preponderance of the evidence, that the Commissioner's determinations are erroneous. *See Cabot v. United States*, 38 Fed. Cl. 682, 694 (1997); *Pototzky v. United States*, 8 Cl.Ct. 308, 315 (1985); *KFOX, Inc. v. United States*, 206 Ct.Cl. 143, 151–52, 510 F.2d 1365, 1369 (1975). "Of course, plaintiffs bear this burden as to each and every element of their claim." *Ghandour v. United States*, 36 Fed. Cl. 53, 59 (1996), *aff'd*, No. 97–5062, 1997 WL 716143 (Fed.Cir. Nov. 17, 1997).

In addition to proving entitlement to a refund of taxes paid, the plaintiffs also essentially bear the burden of disproving the Government's counterclaims. Because IRS assessments are entitled to a presumption of correctness, the "defendant can make out a *prima facie* case by simply introducing the assessment into evidence." *Id.* "Once that *prima facie* case is made out both the burden of going forward with evidence and the ultimate burden of persuasion shifts to the plaintiff[s]." *Pototzky*, 8 Cl.Ct. at 315. In the instant case, the Government properly introduced copies of the respective assessments against Jim and Mary. Consequently, the Michauds "bear the burden of proof with respect to both their claim[s] and the government's counterclaim[s]." *Ghandour*, 36 Fed. Cl. at 59.

By introducing the assessments into evidence, the Government has established a *prima facie* case that Jim and Mary are persons liable for the penalty described in section 6672. The Court's task is to determine whether or not each of the Michauds has met the burden of rebutting the presumption of correctness of the Government's determination.

The two-pronged test for evaluating a section 6672 case has been recited in a multitude of court decisions. "[I]t is clear that, in order to be found liable for the penalty, an individual must have: (1) been under a duty to collect, truthfully account for, and pay over trust fund taxes; and (2) willfully failed to do so or willfully attempted to evade or defeat payment of the tax." *Cabot*, 38 Fed. Cl. at 694; *see also Davis v. United States*, 961 F.2d 867, 869–70 (9th Cir.1992); *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed. Cir.1984); *Ghandour*, 36 Fed. Cl. at 60; *Whiteside*, 26 Cl.Ct. at 568; *Heimark v. United States*, 18 Cl.Ct. 15, 20 (1989); *Po-*

*totzky*, 8 Cl.Ct. at 314. An individual meeting the requirements of the first prong is commonly referred to as a "responsible person." *See Slodov*, 436 U.S. at 246 n. 7, 98 S.Ct. at 1784 n. 7. The case law reveals that the analytical steps must be resolved in order; an individual first must be deemed a "responsible person" before the question of "willfulness" is addressed. If the individual is not a responsible person, the analysis ends, and the individual cannot be found liable for the penalty imposed by section 6672. *See, e.g., Cabot*, 38 Fed. Cl. at 699 (explaining that, "[b]ecause [the plaintiff] was not a responsible person, the court need not address the issue of his willfulness"); *Williams v. United States*, 25 Cl.Ct. 682, 685 (1992) (same); *DiStasio v. United States*, 22 Cl.Ct. 36, 47 (1990) (same). Likewise, even if a taxpayer meets the definition of a "responsible person," section 6672 liability will not attach unless the individual also satisfies the "willfulness" prong. *See, e.g., Greenberg v. United States*, 46 F.3d 239, 244 (3d Cir.1994) (explaining that "[t]he fact that [the plaintiff] is a responsible person does not end our inquiry because IRS may impose section 6672 liability only if a responsible person 'willfully' fails to collect, account for or pay over the withheld taxes"); *Godfrey*, 748 F.2d at 1574 (asserting that "both statutory requirements must be present for the 100 percent penalty to be imposed"); *Pototzky*, 8 Cl.Ct. at 314 (same).

Because the Government's assessments are entitled to a presumption of correctness, Jim and Mary each is presumed to have been a "responsible person" who willfully failed to collect, to account for, or to pay over the trust fund taxes withheld by Superior. "In § 6672(a) cases, once the Government offers an assessment into evidence, the burden of proof is on the taxpayer to disprove his [or her] responsible-person status or willfulness." *Barnett v. IRS*, 988 F.2d 1449, 1453 (5th Cir.1993); *accord Kinnie v. United States*, 994 F.2d 279, 283 (6th Cir.1993). Consequently, the Court must focus on the extent to which each of the Michauds has met the burden of rebutting the presumptions of responsibility and willfulness.

### I. The "Responsible Person" Prong

 In order for a taxpayer to be personally liable under section 6672 for the tax delinquency of a corporation, the individual first must be found to have been a "responsible person" within the employer corporation during the periods in which the payroll tax delinquency accrued. A "responsible person" is one who has "the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations." *Godfrey*, 748 F.2d at 1575 (quoting *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir.1975)). The proper focus is upon "a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes." *Id.* (quoting *White v. United States*, 178 Ct.Cl. 765, 772, 372 F.2d 513, 517 (1967)). More succinctly, "any person with sufficient status, duty, and authority 'to avoid the default' [of withholding tax obligations] is a responsible person under § 6672." *Heimark*, 18 Cl.Ct. at 21 (citations omitted).

The determination of whether or not someone is a "responsible person" "is necessarily a fact-intensive inquiry, and the courts have generally focused on those facts bearing on an individual's 'status, duty, and authority' within the employer corporation." *Ghandour*, 36 Fed. Cl. at 60 (citations omitted); *see also Greenberg*, 46 F.3d at 243; *Gephart v. United States*, 818 F.2d 469, 475 (6th Cir. 1987); *Mazo v. United States*, 591 F.2d 1151, 1156 (5th Cir.1979); *Sale v. United States*, 31 Fed. Cl. 726, 731 (1994); *Hammon v. United States*, 21 Cl.Ct. 14, 24 (1990). Status is measured by the individual's ownership stake in the entity and position within the corporate structure. *See Ghandour*, 36 Fed. Cl. at 60. Duties are "viewed in light of [an individual's] power to compel or prohibit the allocation of corporate funds." *Godfrey*, 748 F.2d at 1576. "[T]he crucial inquiry is whether a person had a duty to oversee, manage, or administer the financial affairs of the company, specifically with reference to the paying of creditors and taxes." *Ghandour*, 36 Fed. Cl. at 61. Authority is evaluated in terms of the individual's "actual author-

ity." Hallmarks of actual authority include the ability to vote a large block of stock, to hire and fire employees, to prepare corporate tax strategies, and to sign corporate checks. *See id.*

It is clear from the facts already stated that Mr. Pasternak had the requisite status, duties, and authority to be a "responsible person" with respect to Superior. He autocratically controlled the corporation in his positions as president and treasurer. He had the power to compel or to prohibit the allocation of corporate funds, and he actually compelled or appropriated the corporate funds intended for tax payments to his own pocket. He assigned duties within the company so that he alone had the task of administering the financial affairs of Superior, specifically with respect to paying creditors and taxes. He had the actual authority to avoid the default of Superior's tax payments. Through the admissions made to his coinvestors and his criminal plea agreement, Mr. Pasternak has made clear that he was the person at Superior with the power to control the decision-making process by which company funds were used for purposes other than the payment of taxes.

■ This case is before the Court, however, because the Government has alleged that, in addition to Mr. Pasternak, Jim and Mary Michaud also were "responsible persons" who should suffer the drastic sanction of personal liability for Superior's entire payroll tax delinquency. In assessing the plaintiffs' challenges to the Government's assessment, this Court must examine the status, duties, and authority of both Jim and Mary to determine whether either was a "responsible person" subject to the severe penalty imposed by section 6672.[20] In addressing this issue, the Court is mindful that the holding of a corporate office in itself is not sufficient to

trigger section 6672 liability. *See Godfrey,* 748 F.2d at 1575; *Ghandour,* 36 Fed. Cl. at 60. In addition, an inquiry into a person's status, duties, and authority is a test of substance, not form. *See Godfrey,* 748 F.2d at 1576. "The courts recognize the normal division of and limitations on authority exercised by various representatives of a particular business." *Id.* (quoting *Bauer v. United States,* 211 Ct.Cl. 276, 288, 543 F.2d 142, 149 (1976)). The overwhelming weight of case precedent requires that the Court look through the status and mechanical functions of the various officers and identify the person or persons with the power to control the decision-making process by which the employer corporation allocated funds to other creditors in preference to its withholding tax obligations. *See id.* at 1575.

### A. Jim Michaud

The defendant contends that Jim was a "responsible person" throughout the existence of Superior, a contention based primarily on his position as a director, officer, and shareholder of the corporation. Jim contends that he was never a "responsible person," with the possible exception of that brief period of time on December 21, 1987, between the redemption of Mr. Kuntz's shares and Jim's resignation from the company. After a thorough review of the testimony and briefs presented, the Court finds that neither party's position is tenable. For the reasons stated below, the Court finds that Jim has successfully rebutted the Government's determination of his "responsible person" status for the period beginning with Superior's inception on October 24, 1983, and ending on November 30, 1987. The Court further finds, however, that Jim has failed to rebut the presumption that he was a "responsible

**20.** Although Jim's case has been consolidated with Mary's case, the Court does not lose sight of the fact that each plaintiff has been assessed individually with personal liability for the unpaid trust fund taxes. The Government stresses that the plaintiffs *individually* may be considered "responsible persons" based on their *combined* voting powers, directorships, and salaries. The Court rejects that assertion. As discussed in this opinion, the 100 percent penalty authorized by section 6672 cannot be imposed in the absence

of personal fault. To adopt the defendant's theory of imputing the status, duties, and authority of one individual to another for the purpose of making a "responsible person" determination would be to abrogate the requirement of *personal* fault. Consequently, the status, duties, and authority of the plaintiffs in their individual capacities must be examined to determine whether or not each was a "responsible person" during the time that Superior's tax delinquency accrued.

person" from December 1, 1987, through December 21, 1987.

1. *October 24, 1983, through November 30, 1987*

■ Jim presented substantial evidence to show that he was not a "responsible person" from October 24, 1983, through November 30, 1987. The composite of Jim's status, duties, and authority during that period reveals that he did not have "the power to control the decision-making process by which the employer corporation allocate[d] funds to other creditors in preference to its withholding tax obligations." *Godfrey,* 748 F.2d at 1575.

From the outset, Jim was one of Superior's three directors. He also held the office of vice president throughout the company's existence. Along with Mary, he was a joint owner of a twenty-five percent ownership interest in the entity.

As a minority shareholder and one of three directors, Jim had no independent ability to force the corporation to take, or to refrain from, any action. He could not compel Mr. Pasternak to do anything that the president did not want to do. "Vice president" was effectively an honorary title, rendered insignificant by an autocratic president. Jim was afforded no noticeable respect by employees of Superior by virtue of his officer title. He was viewed, by himself and virtually all credible witnesses who testified at trial, as the head of sales and marketing, responsible for soliciting business. He held that position as an employee at Superior Services and continued in that role when Superior was created.

Although titled "vice president," Jim did not have an active role in the day-to-day fiscal management of Superior. Due to his sales and marketing roles, he spent substantial time away from the office. As vice president, he would have been responsible for overseeing the company's affairs in the president's absence. Mr. Pasternak, however, was never absent; even when working at customer's facilities, the president stopped by the Superior offices daily to direct his corporation's operations.

Jim's status did not change from Superior's incorporation through November 30, 1987. Even after discovering, in October 1987, that the company was having tax difficulties, Jim maintained his marketing role. Assured by the corporate president that the taxes were being handled by attorneys, Jim reasonably continued business as usual. His awareness that Superior had some sort of tax difficulty did not effect a change in his status and is irrelevant to the ultimate issue of whether or not he was a "responsible person" for purposes of section 6672(a). *See Godfrey,* 748 F.2d at 1576 (asserting that knowledge of withholding tax deficiencies may be relevant to the issue of willfulness, but is irrelevant to the question of whether or not a taxpayer is a "responsible person"). The credible trial exhibits and testimony reveal that, until December 1, 1987, Jim's status did not indicate that he was "a person with ultimate authority over expenditure of funds." *Id.* at 1575.

Turning to his duties, Jim was responsible for marketing and sales and spent a considerable amount of time away from Superior's offices in the performance of his marketing duties. He was charged with placing engineers at customers' facilities in a way that would best serve each customer's needs. The corporate bylaws did not charge Jim with any specific duties in his position as vice president.

Jim had no significant role in the financial affairs of Superior. Although he cursorily reviewed financial statements, he had insufficient financial knowledge to understand them. He did not make strategic decisions regarding corporate tax matters, negotiate with lenders, sign company tax returns, prepare financial statements, meet with accountants, approve company payrolls, or determine which creditors would or would not be paid. "As the case law makes abundantly clear, a person's 'duty' under § 6672 must be viewed in light of his power to compel or to prohibit the allocation of corporate funds." *Godfrey,* 748 F.2d at 1576. Jim has presented substantial evidence that, up until December 1, 1987, he did not have the power to compel or prohibit the allocation of corporate funds.

In reviewing his authority, it appears that Jim had the authority to determine where to place particular engineers. Mr. Pasternak may have delegated to Jim the authority to hire engineers, but it is unclear from the facts whether the authority extended to firing as well. By virtue of his positions as a director and an officer, Jim had the authority to demand access to the corporate books and records related to Superior's financial affairs. Even when he cursorily reviewed such corporate records, however, his financial unsophistication prevented him from identifying any irregularities. Jim had no authority to compel the corporation to take any action by virtue of his shareholder status, as he did not hold a controlling interest. The bylaws granted no specific authority to Jim by virtue of his position as vice president, except in the absence or incapacity of the president. Jim never had signature authority on any Superior bank account. It does not appear that he had the authority to enter into contracts on behalf of the corporation. He did not make financial decisions for the company.

In examining authority for purposes of section 6672, "[t]he inquiry must focus on actual authority to control, not on titles or trivial duties." *Heimark*, 18 Cl.Ct. at 23. It is clear that Jim's "actual authority" was over areas removed from Superior's financial matters and that the limited authority he had was diminished considerably by Mr. Pasternak's complete dominance over the company. Jim has shown with substantial credible evidence that, until December 1, 1987, he was not "a person with ultimate authority over expenditure of funds," *Godfrey*, 748 F.2d at 1575, and thus not a "responsible person."

## 2. *December 1, 1987, through December 21, 1987*

On December 1, 1987, however, Jim's position in Superior dramatically changed. On that day, he and Mr. Schutte confronted Mr. Pasternak at the president's home. At that gathering, Mr. Pasternak revealed that the tax problem was much more serious than he had led people to believe, that he was the sole cause of Superior's tax delinquency, and, prophetically, that he feared that he was headed to prison. Mr. Dallman, via telephone, reiterated the dire nature of the situation and suggested that the investors consider selling Superior. Over the course of the meeting, it became apparent to Jim and Mr. Schutte that the company's president was too concerned with his own personal circumstances to worry about the fate of Superior. Consequently, on December 1, 1987, Jim took it upon himself to carry out the sale recommended by Mr. Dallman. The composite of his status, duties, and authority reveals that, between December 1, 1987, and the sale of Superior on December 21, 1987, Jim was a "responsible person" for section 6672 purposes.

From December 1, 1987, until immediately prior to the sale of Superior, Jim retained his position as vice president and as one of three directors. He continued to hold a minority stake in Superior. However, he became much more involved with the day-to-day fiscal affairs of the company. He undertook an evaluation of the corporation's assets. He was able to retrieve a certificate of deposit from Mr. Pasternak's wife and deposit it for the company's benefit. He ordered an accounting of Superior's stake in a used automobile business. Jim exercised the power, granted by the corporate bylaws, to act in a situation where the company president either refused or was unable to act. By so enhancing his status, Jim was able to marshal the corporate assets in preparation for the sale of Superior.

Jim's enhanced status alone, however, is insufficient to deem him a "responsible person" as of December 1, 1987. While his status enabled him to marshal assets, it did not, by itself, make him a person with "the power to control the decision-making process by which the employer corporation allocate[d] funds to other creditors in preference to its withholding tax obligations." *Godfrey*, 748 F.2d at 1575.

In addition to the normal duties he had always performed, Jim assumed all duties related to the impending sale of Superior. He took the lead in arranging for the transfer of company assets to SRG. These additional duties, however, did not on their face encompass a duty to "collect, account for, and pay over" taxes, a prerequisite for meeting

the "responsible person" prong of the section 6672 test for liability. *Cf. id.* at 1576 (asserting that the mere fact that a corporation's chairman of the board "took the lead .in attempting to avoid [the company's] insolvency, negotiated emergency loans and recapitalization plans, helped to arrange for sale of corporate assets, and participated in the hiring and firing of top corporate management * * * do[es] not in [it]sel[f] give rise to a 'duty' under the statute, i.e. to 'collect, account for, and pay over' taxes."). Combined with his enhanced status and authority, however, it appears that such duty did fall upon Jim in December 1987.

Jim's actual authority substantially increased when he consciously decided, on December 1, 1987, to take charge of the sale of Superior. Tremendous authority over corporate affairs fell onto Jim by default on this date as well, after the formerly autocratic president abandoned all but a titular role in the company and entered a period of confusion and depression. Jim had the actual authority to demand the return of a certificate of deposit held by Mr. Pasternak's wife, to demand an accounting of the company's investment in a used automobile business, and to request that Mr. Schutte sign a proxy authorizing Jim to vote Mr. Schutte's shares.

The most critical inquiry, however, is whether or not Jim's authority, when viewed in conjunction with his status and duties, enabled him to "avoid the default" of Superior's payroll taxes. *Heimark*, 18 Cl.Ct. at 21. It is unclear who had the ultimate authority to avoid a default of tax payments between December 1, 1987, and December 21, 1987. What is clear is that either Jim or Mary, or perhaps both, had sufficient status, duties, and authority to avoid the default. Indeed, the plaintiffs' briefs make much of the fact that Jim and Mary collectively ensured that Superior did not default on its December 1987 payroll taxes.

The defendant, by submitting the tax assessment into evidence, is entitled to a presumption that Jim was a "responsible person" between December 1, 1987, and December 21, 1987. Jim has not presented substantial evidence to rebut the presumption that he possessed sufficient sta-

tus, duties, and authority to be considered a "responsible person" during that period. Consequently, this Court is constrained to find that Jim was a "responsible person" between December 1, 1987, and December 21, 1987.

### B. *Mary Michaud*

■ The Government contends that Mary was a "responsible person" throughout Superior's existence. Its position is based on her status as a director, officer, and shareholder, her financially-related duties and her corporate check-signing authority. Mary contends that she was never a "responsible person," with the possible exception of that brief period of time on December 21, 1987, between the redemption of Mr. Kuntz's shares and Mary's resignation from the company. As in the case of Jim, the Court finds that the truth lies between the parties' positions. For the reasons stated below, the Court finds that Mary has successfully rebutted the Government's determination of her "responsible person" status for the period of October 24, 1983, through October 31, 1987. She has failed, however, to rebut the presumption that she was a "responsible person" from November 1, 1987, through December 21, 1987.

### 1. *October 24, 1983, through October 31, 1987*

Mary has successfully shown that, between Superior's incorporation on October 24, 1983, and October 31, 1987, her status, duties, and authority did not give her "the power to control the decision-making process by which the employer corporation allocate[d] funds to other creditors in preference to its withholding tax obligations." *Godfrey*, 748 F.2d at 1575.

Mary was one of Superior's three directors. She held the office of corporate secretary throughout the company's existence. Along with Jim, she was a joint owner of a twenty-five percent ownership interest in Superior.

As one of three directors and a minority shareholder, Mary had no independent ability to compel the corporation to take, or to

refrain from, any action. She could not make the president do anything that he did not want to do. Her role as an officer was rendered insignificant by Mr. Pasternak's dominance over corporate affairs. She was not afforded respect by Superior employees by virtue of her officer title; Mary was viewed by the credible witnesses at trial as a secretary/receptionist, payroll clerk, or office manager. In addition, Mary's modest salary, which ranged from $15,600 to slightly over $29,000, further strengthens the view that her status in the corporate structure was marginal.

The facts extracted from the trial exhibits and testimony support a finding that Mary's title of "secretary" was a mere formality and did not coincide with the duties and authority actually bestowed upon her. The credible evidence reveals that, until November 1, 1987, Mary did not have the status within Superior to make her "a person with ultimate authority over expenditure of funds." *Godfrey*, 748 F.2d at 1575.

In examining her duties, it is apparent that Mary was responsible for managing the corporate office. She supervised the few individuals who worked on the administrative staff. She determined, with the help of Mr. Anderson, which computer system should be installed in the office. She opened Superior's mail, with the notable exception of governmental correspondence, which was handed unopened to Mr. Pasternak in accordance with his instructions.

Some of Mary's duties touched the company's finances. She forwarded lists of accounts payable, along with unsigned checks, to Mr. Pasternak. Upon his approval of the expenditures, Mary prepared the checks and paid the creditors. She functioned as a data processor, inputting into the computer numbers representing accounts payable and accounts receivable. She generated computer financial reports at the president's request, but, due to her financial ignorance, she was unable to discern what the various figures meant. In addition, Mary was charged with certain ministerial duties involving the payroll. She calculated gross pay for personnel by multiplying hours worked by their respective hourly rates. She referred to a with-holding chart to determine the amounts to be withheld from the employees' wages for taxes and entered these figures into the corporate books or, in later years, into the computer. Mary had no control, however, over the ultimate disbursement of the amounts withheld from the employees' wages. Mary also initially was charged with basic bookkeeping duties, but her inability to perform such tasks caused the president to hire Mr. Anderson, and later Mr. Brice, to handle the company's accounting duties.

Mary's interaction with Superior's finances consisted of ministerial payroll duties, data processing tasks, and the preparation of checks upon approval of expenditures by Mr. Pasternak. While these functions undoubtedly were important to the smooth operation of the business, they do not indicate that Mary had a significant role in the financial *management* of Superior. Her duties did not encompass any discretionary ability to direct or to prevent payment of corporate funds. Although she generated financial reports, she lacked financial knowledge that would enable her to understand them. She did not make strategic decisions regarding corporate tax matters, file or sign corporate tax returns, or negotiate with lenders. While she calculated the company payroll, only Mr. Pasternak could approve it. She prepared checks to creditors only after the president approved the expenditures. Only Mr. Pasternak could determine which creditors would or would not be paid.

Mary's duties "must be viewed in light of [her] power to compel or prohibit the allocation of corporate funds." *Godfrey*, 748 F.2d at 1576. Viewed in this light, her duties weigh against a finding that she was a "responsible person" prior to November 1, 1987.

By virtue of her positions as a director and an officer, Mary had the authority to demand access to the corporate books and records related to Superior's financial affairs. Even if she had exercised such authority, however, she would not have been able to make sense of the documents, due to her limited education and lack of experience with finances. Mary had input into hiring decisions regarding secretarial personnel, and she supervised the office staff; it does not appear that she

could hire or fire personnel without the approval of Mr. Pasternak.

Mary also had check-signing authority. Until November 1, 1987, however, Mary did not have the authority to approve expenditures. Although some of the defendant's witnesses testified otherwise, the weight of the credible evidence tips toward the finding that Mary's check-signing authority extended only to those expenses that were approved for payment by Mr. Pasternak. Because she had no discretion over which checks to sign, her function was purely ministerial. The mechanical duty of signing checks does not make Mary a "responsible person" under section 6672. *See Godfrey,* 748 F.2d at 1575.

The bylaws granted no specific authority to Mary by virtue of her position as corporate secretary. Mary also had no authority to compel Superior to take any action by virtue of her shareholder status, as she did not hold a controlling interest. She had no authority to decide to pay other creditors in preference to taxing authorities. She did not make financial decisions for the company and had no authority over the corporation's tax strategies. Looking through her corporate title, it is apparent that Mary had no actual authority to control the financial affairs of the company. The actual authority that she possessed was centered on administrative matters separate from Superior's taxes, and even that authority was marginalized by Mr. Pasternak's dominance over all corporate affairs.

Mary has successfully shown that, through October 31, 1987, she did not have "the power to control the decision-making process by which the employer corporation allocate[d] funds to other creditors in preference to its withholding tax obligations." *Godfrey,* 748 F.2d at 1575. Consequently, the Court finds that Mary was not a "responsible person" between October 24, 1983, and October 31, 1987.

2. *November 1, 1987, through December 21, 1987*

 At some point after IRS Special Agent Jim Hill's October 22, 1987 visit, Mr. Pasternak relinquished his iron grip on the financial affairs of Superior. He apparently became much more concerned with his personal tax problems than with the well-being of Superior. Lists of accounts payable and unsigned checks languished unapproved on his desk. Creditors hounded Mary for their payments. Eventually, Mary took matters into her own hands and prepared and signed checks to the creditors without the requisite approval by Mr. Pasternak. Little did she realize that, by doing what was necessary to keep the company afloat during a very chaotic period, she technically became a "responsible person."

At the point that Mary usurped the president's authority by unilaterally signing checks to pacify Superior's creditors, her status, duties, and authority were of sufficient magnitude to make her a "responsible person." She became "a person with ultimate authority over expenditure of funds," *Godfrey,* 748 F.2d at 1575, one who "control[led] the decision-making process by which the employer corporation allocate[d] funds," *id.,* and a "person with sufficient status, duty, and authority 'to avoid the default' " of payroll tax payments. *Heimark,* 18 Cl.Ct. at 21. By approving on her own the payment of corporate obligations that the president neglected to approve, Mary met the parameters of the section 6672 "responsible person" test.

Although Mary admits to paying creditors without Mr. Pasternak's approval, she argues that she was not a responsible person because Mr. Pasternak still retained his positions as president and as treasurer at the time. That argument is unavailing. A company can have more than one "responsible person," *Gephart,* 818 F.2d at 473, and Mary clearly fit the definition when she became the person who ultimately decided which creditors would receive the checks.

The record does not provide the exact date on which Mary began paying creditors without the president's approval, but November 1, 1987, is the date that best can be extrapolated from the following exchange between the defense counsel and Mary:

Q: After October, 1987, was it not you who basically selected the vendors to be paid?

A: After October of 1987?

Q: Yes.

A: I would say that yes, I was the one who selected them.

(Tr. at 524.) The earliest date after October 1987 is November 1, 1987. The Government is entitled to a presumption that Mary was a "responsible person" as of November 1, 1987. Mary has not produced substantial evidence to rebut the presumption; on the contrary, her testimony confirms that she was a person with authority to control the disbursement of Superior's funds after October 1987. The Court, therefore, is compelled to find that Mary was a "responsible person" during the period of November 1, 1987, through December 21, 1987.

## II. *The "Willfulness" Prong*

█ Only a "responsible person" can be personally assessed for the tax liability of a corporation under section 6672. Attaining the status of a "responsible person" does not, however, encompass strict liability for a company's tax delinquency. A "responsible person" can be assessed with a 100 percent penalty under section 6672 only if he or she "willfully" fails to collect, to account for, or to pay over to the Government trust fund taxes of the company. It is this "willfulness" prong that ensures that personal liability under section 6672 will be imposed only on "responsible persons" who have exhibited personal fault in thwarting the Government's efforts to collect trust fund taxes. *See Slodov*, 436 U.S. at 254, 98 S.Ct. at 1788–89 (recognizing that section 6672 "does not impose an absolute duty on the responsible person to pay back taxes," and "cannot be construed to impose liability without fault."); *Godfrey*, 748 F.2d at 1579 (holding that a plaintiff could not be liable under section 6672 because the plaintiff lacked "the element of personal fault * * * that is the epitome of willfulness.").

There does not appear to be any dispute that Mr. Pasternak is liable for the 100 percent penalty imposed by section 6672. Mr. Pasternak has admitted, through his criminal plea agreement and admissions to his coinvestors, that he was a "responsible person" who "willfully" failed to pay over Superior's trust fund taxes. The Government alleges, however, that Jim and Mary Michaud also were "responsible persons" who "willfully" failed to pay over Superior's payroll taxes and that each plaintiff is liable for the section 6672 penalty.

The Court has found that for the vast majority of Superior's existence, including the entire time during which Mr. Pasternak diverted funds from withheld employee wages to his own personal benefit, neither Jim nor Mary was a "responsible person" with respect to Superior. The Court's determination that each plaintiff attained the status of "responsible person" for a brief period at the end of Superior's life, however, necessitates an inquiry into whether or not either plaintiff "acted 'willfully' in failing to collect, truthfully account for, or pay over the delinquent and unpaid federal taxes." *Sale*, 31 Fed. Cl. at 732.

█ A "responsible person" manifests personal fault amounting to a "willful" failure to collect and to pay over taxes by making "a deliberate choice voluntarily, consciously, and intentionally * * * to pay other creditors instead of paying the Government." *Godfrey*, 748 F.2d at 1577 (citation omitted). In lieu of this "deliberate choice" standard, the "willfulness" prong is satisfied " 'if the responsible person acts with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government, * * * such as by failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted.' " *Id.* at 1578 (quoting *Mazo*, 591 F.2d at 1154).

█ In analyzing the "willfulness" prong as it applies to the plaintiffs, the Court notes that " '[m]ere negligence in failing to ascertain facts regarding a tax delinquency' * * * 'is insufficient to constitute willfulness under the [tax] code.' " *Id.* at 1577. In addition, the Court recognizes that "[t]he primary focus of the willfulness test is the taxpayer's diligence in attending to the duty to pay employment taxes. By undertaking all reasonable efforts to fulfill that duty, taxpayers can show that they did not willfully neglect their obligations under § 6672." *Hammon*, 21 Cl.Ct. at 27.

### A. "Willfulness" During the Assessed Tax Periods

"An important factor in the willfulness determination here is the period to which the assessment relates." *Godfrey,* 748 F.2d at 1578. The IRS has assessed a 100 percent penalty against Jim and Mary based on Superior's nonpayment of payroll taxes due for the last quarter of 1985, all of 1986, and the first three quarters of 1987. The plaintiffs have succeeded in showing that neither Jim nor Mary was a "responsible person" during the periods in which the tax delinquency accrued. Because the plaintiffs were not "responsible persons" during the time that the tax liabilities accrued, the issue of their willfulness during the relevant tax periods is moot. *See Cabot,* 38 Fed. Cl. at 699; *Williams,* 25 Cl.Ct. at 685; *DiStasio,* 22 Cl.Ct. at 47.

Mary was a "responsible person" from November 1, 1987, through December 21, 1987. Jim was a "responsible person" from December 1, 1987, through December 21, 1987. It is only within these respective periods that either plaintiff potentially could meet both prongs of the section 6672 test for personal liability. The last quarter of 1987, however, is not a period for which the IRS has assessed a penalty against either plaintiff. Even if the plaintiffs had been so assessed, it is clear that neither plaintiff "willfully" failed to pay over withholding taxes during their respective reigns as "responsible persons," *i.e.,* the payroll taxes that accrued during November and December of 1987 were paid.

In summary, between Superior's incorporation and the end of the third quarter of 1987, neither plaintiff was a "responsible person." Between November 1, 1987, and December 21, 1987, in Mary's case, and between December 1, 1987, and December 21, 1987, in Jim's case, each plaintiff was a "responsible person," but neither met the "willfulness" prong. The inquiry, however, does not end there. Two judicially-created addenda to the "willfulness" prong, the "after-acquired funds" doctrine and the "existing funds" doctrine, remain to be addressed.

### B. The "After–Acquired Funds" Doctrine

The defendant contends that "willfulness" may be attributed to Jim and Mary by virtue of the "after-acquired funds" doctrine. Under that theory, each plaintiff would be liable for a substantial portion of the amount assessed by the Government under section 6672. The plaintiffs contend that the doctrine has no application under the facts presented in this case. The Court agrees with the plaintiffs.

After reviewing the relevant case law, the Court finds that the "after-acquired funds" doctrine best may be stated as follows: when a taxpayer has been a "responsible person" in a corporation throughout the time that tax delinquencies accrued, that person is obligated to apply to the overdue tax liability all unencumbered[21] funds acquired by the corporation after the individual becomes aware of the delinquency. *See Kinnie,* 994 F.2d at 285; *Davis,* 961 F.2d at 875–76; *Honey v. United States,* 963 F.2d 1083, 1089 (8th Cir.1992); *Mazo,* 591 F.2d at 1154.

If the doctrine is applicable, the Government can prove the "willfulness" prong merely by showing that a "responsible person" directed after-acquired unencumbered funds to creditors other than the IRS. Violation of the doctrine, when it applies, is "proof of willfulness as a matter of law," *Honey,* 963 F.2d at 1089, because the "responsible person" demonstrates that requisite degree of personal fault "that is the epitome of willfulness." *Godfrey,* 748 F.2d at 1579.

Where a taxpayer was a "responsible person" at all times during which the tax delinquency accrued, personal fault justifiably is attributed to that individual because he "failed to fulfill his responsibilities during the time that the tax delinquency accrued." *Kinnie,* 994 F.2d at 285. Plainly, "[w]hen the same individual or individuals who caused

---

**21.** "[F]unds are encumbered only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and if that legal obligation is superior to the interest of the IRS in the funds." *Honey,* 963 F.2d at 1090; *accord Huizinga v. United States,* 68 F.3d 139, 145 (6th Cir.1995).

the delinquency in any tax quarter are also the 'responsible persons' at the time the Government's efforts to collect from the employer have failed, and it seeks recourse against the 'responsible employees,' * * * there is no question that § 6672 is applicable to them." *Slodov*, 436 U.S. at 245–46, 98 S.Ct. at 1784. A "responsible person" violating the "after-acquired funds" doctrine becomes liable under section 6672 to the extent of those after-acquired unencumbered corporate funds that are used to pay creditors other than the United States. *See Kinnie*, 994 F.2d at 285 (applying the doctrine to affirm judgment against a "responsible person" in an amount greater than the corporate funds on hand at the time the taxpayer learned of the company's tax deficiency).

In all of the cases cited by the defendant in support of application of the "after-acquired funds" doctrine, the taxpayer against whom the doctrine was applied was a "responsible person" during the entire time that the company's tax delinquency accrued. If a taxpayer was not a "responsible person" during the quarters that a corporate tax delinquency accrued, however, it appears that the doctrine would not apply. Two considerations counsel against applying the doctrine against a taxpayer in such a case. First, the requisite personal fault that is implicit in a violation of the doctrine does not exist if the individual was not a "responsible person" at the time the company failed to pay over its withholding taxes. Second, an important policy consideration weighs against using the doctrine in such a case:

> to hold a taxpayer personally liable to the extent of after-acquired funds for taxes owed during a time in which he was not a responsible person would be to discourage new investors from attempting to salvage a failing business, which, if the salvage effort were successful, would enable the government to collect more in delinquent taxes than if the business failed.

*Kinnie*, 994 F.2d at 285 (citing *Slodov*, 436 U.S. at 252–53, 98 S.Ct. at 1787–88).

The defendant contends that the "after-acquired funds" doctrine applies to each plaintiff in this case. The Government asserts that Mary learned of Superior's tax problems by October 22, 1987, and that after that date Superior directed unencumbered funds totaling $634,207.15 to creditors other than the United States. The defendant also asserts that Jim had learned of Superior's tax problems by October 27, 1987, and that after that date Superior directed $534,119.35 of unencumbered funds to creditors other than the Government. Invoking the "after-acquired funds" doctrine, the defendant contends that Mary is liable to the Government in the amount of $634,207.15 and that Jim is liable for $534,119.35.

The Government's argument is unavailing because it is premised on the assumption that the plaintiffs were "responsible persons" throughout the time that Superior's tax liabilities accrued. The Court has found, however, that neither Jim nor Mary was a "responsible person" during any of the tax quarters for which Superior is delinquent. The "after-acquired funds" doctrine, therefore, does not apply to either of them, because neither was a "responsible person" who had section 6672 "responsibilities *during* the time that the tax delinquency accrued." *Kinnie*, 994 F.2d at 285 (emphasis added). The requisite personal fault required for the imposition of personal liability via the "after-acquired funds" doctrine simply is not present.

In addition to the absence of personal fault, a policy rationale akin to that expressed in *Slodov* and *Kinnie* counsels against applying the "after-acquired funds" doctrine in the instant case. To apply the doctrine against the plaintiffs here would be to discourage officers and employees who are not "responsible persons" from becoming "responsible persons" and doing all they reasonably can to maximize the Government's recovery of delinquent taxes from the employer corporation.

Because the "after-acquired funds" doctrine is inapplicable, neither Jim nor Mary was under a personal obligation to use funds acquired by the corporation, after each became a responsible person, to pay down Su-

perior's tax delinquency.[22]

## C. The "Existing Funds" Doctrine

■ Under the "after-acquired funds" doctrine, a "responsible person" can be found "willful," and thus subject to personal liability for the tax arrears of a corporation, if that individual was a "responsible person" during the time that the tax delinquency accrued, and if, after becoming aware of the delinquency, the person diverts subsequently acquired, unencumbered corporate funds to other creditors in preference to the IRS. At the other end of the spectrum, an individual who does not become a "responsible person" until after the tax delinquency has accrued is not subject to personal liability for using after-acquired funds for purposes other than paying down a corporate tax liability caused by a prior regime of "responsible persons." See Slodov, 436 U.S. at 259–60, 98 S.Ct. at 1791–92. The only remaining issue is whether or not any liability under section 6672 may attach to an individual who becomes a "responsible person" after a corporation's withholding tax deficiency has accrued. The United States Supreme Court addressed this precise issue in Slodov, and in that case set forth the standards that this Court will refer to as the "existing funds" doctrine.

Slodov involved a taxpayer who became a "responsible person" relative to three corporations "at a time when a delinquency existed for unpaid trust-fund taxes, while the specific funds withheld but not paid had been dissipated by predecessor officers and when the corporations had no liquid assets with which to pay the overdue taxes." Slodov, 436 U.S. at 246, 98 S.Ct. at 1784–85. Through normal business operations, the corporation subsequently acquired funds, which the taxpayer used to pay other creditors rather than to pay down the company's preexisting withholding tax delinquency. Under these circumstances, the Court held:

that the responsible person * * * does not violate § 6672 by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States when at the time he assumed control there were no funds with which to satisfy the tax obligation and the funds thereafter generated are not directly traceable to collected taxes referred to by that statute.

Slodov, 436 U.S. at 259–60, 98 S.Ct. at 1791. The holding affirms that the "after-acquired funds" doctrine does not apply to an individual who does not become a "responsible person" until after the corporate tax delinquency accrues. In addition, the holding reassures newly-minted "responsible persons" that they need not "order the impossible" by directing nonexistent funds to the taxing authority in satisfaction of a previous regime's tax delinquency. See Ghandour, 36 Fed. Cl. at 62 (citing Godfrey, 748 F.2d at 1577).

■ Although not applicable to the specific plaintiff in Slodov, the Supreme Court in that case also addressed the situation where funds exist at the time an individual becomes a "responsible person," holding "that a 'responsible person' under § 6672 may violate the 'pay over' requirement of that statute by willfully failing to pay over trust funds collected prior to his accession to control when at the time he assumed control the corporation has funds impressed with a trust under § 7501." Slodov, 436 U.S. at 259, 98 S.Ct. at 1791. Two important points flow from this holding. First, and not surprisingly, a "responsible person" will not be personally liable under the "existing funds" doctrine unless the individual "willfully" fails to pay over existing trust funds. Second, under the "existing funds" doctrine, the maximum amount for which a new "responsible person" can be liable under section 6672 is the balance of trust funds existing in the corporate coffers

---

**22.** The corporate entity, of course, remained liable for all of its corporate tax liabilities. But in this case, where the Michauds were not "responsible persons" at the time Mr. Pasternak diverted trust fund taxes to his personal benefit, it is not proper to invoke the "after-acquired funds" doctrine as a way of "piercing the corporate shield" to impose personal liability upon the plaintiffs for the tax debts of the corporation. Similar to the plaintiff in Slodov, a case more fully discussed infra, the Michauds were not "responsible persons" at the time that corporate trust fund taxes were wrongfully dissipated. Consequently, under the holding of Slodov, they are not subject to personal liability for using corporate funds acquired by Superior after they became "responsible persons" for purposes other than the payment of tax arrears caused by Mr. Pasternak.

at the time the individual becomes a "responsible person." *See Mazo,* 591 F.2d at 1154 (reiterating the *Slodov* determination that the duty of "a person assuming corporate control with respect to the accrued withholding tax liability [is] limited to paying any trust funds related to that liability and any other funds directly traceable to those trust funds that had been dissipated.").

The record in this case does not reveal whether or not Superior had specific funds attributable to collected but unpaid trust fund taxes in its accounts on November 1, 1987, in Mary's case, or on December 1, 1987, in Jim's case. Such a determination, however, is not required for the disposition of the instant suit.

If all of the monies withheld from the employees' wages under Mr. Pasternak's regime had been dissipated by the time each plaintiff respectively ascended to the position of "responsible person," then the Michauds would be in the exact situation as the plaintiff in *Slodov.* There would have been no existing trust funds to pay over to the IRS, and thus the plaintiffs would not be subject to personal liability under section 6672. The law does not obligate them to "order the impossible" by paying over to the IRS trust fund taxes that were dissipated by a prior "responsible person." *See Ghandour,* 36 Fed. Cl. at 62.

If, on the other hand, Superior was in possession of funds traceable to withheld trust fund taxes at the time each Michaud became a "responsible person," the "existing funds" doctrine must be considered. Each plaintiff could be liable for the balance of such existing trust funds to the extent that each plaintiff willfully diverted those funds to recipients other than the United States. The Court finds, however, that, even if such funds existed (*i.e.,* were not dissipated by Mr. Pasternak) and were paid to creditors other than the IRS, the plaintiffs still would not incur liability under section 6672 because each has presented sufficient evidence to show that they did not *willfully* fail to pay over such funds.

Personal liability under section 6672 cannot be imposed in the absence of personal fault, even under the "existing funds" doctrine, because it is only personal fault that satisfies the "willfulness" prong of that provision's test for liability. *See Slodov,* 436 U.S. at 255, 98 S.Ct. at 1789; *Godfrey,* 748 F.2d at 1579. In evaluating personal fault, "[t]he primary focus * * * is the taxpayer's diligence in attending to the duty to pay employment taxes. By undertaking all reasonable efforts to fulfill that duty, taxpayers can show that they did not willfully neglect their obligations under § 6672." *Hammon,* 21 Cl. Ct. at 27.

The Court finds that, even if funds attributable to withheld trust fund taxes existed on the date that each plaintiff became a "responsible person," neither plaintiff exhibited the requisite personal fault to meet the "willfulness" prong of the section 6672 test for liability, even given the "existing funds" doctrine. Each plaintiff has presented substantial evidence showing that they were "diligen[t] in attending to the duty to pay employment taxes." *Hammon,* 21 Cl.Ct. at 27. Jim and Mary ensured that the payroll taxes that accrued after each became a "responsible person" were paid to the IRS rather than to other creditors. Given a reasonable plan of action by the attorney most familiar with Superior's tax matters, Jim put the company in position for the sale recommended by counsel by marshaling assets, seeking out a buyer, and negotiating a deal that would maximize the amount of money Superior could pay the IRS to reduce its tax deficit. Indeed, the uncontested figures presented by the plaintiffs show that the financial arrangement has already resulted in the IRS receiving more than either the liquidation value or the fair market value of Superior's assets at the end of its existence in December 1987.

In light of the chaotic circumstances surrounding the sudden exposure of Mr. Pasternak's diversion of trust fund taxes, the Michauds' lack of financial sophistication, the long-term deceit by Mr. Pasternak with respect to corporate taxes and finances, and the Michauds' good-faith efforts in paying current payroll taxes while maximizing the Government's realization on the sale of Superior, the Court finds that Jim and Mary each took all reasonable efforts to see that the

corporation's employment taxes would be paid. The "absence of willfulness can be proved by an affirmative showing that the responsible person[s] did *not* disregard [their] duties." *Feist v. United States,* 221 Ct.Cl. 531, 542, 607 F.2d 954, 961 (1979). The Michauds have made such a showing. Consequently, even if Superior had funds in its accounts specifically traceable to withholding taxes collected under Pasternak's regime at the times that the Michauds became "responsible persons," neither Jim nor Mary displayed the requisite personal fault necessary to find them "willful" under the section 6672 test for personal liability.

In summary, the plaintiffs have rebutted the presumption of correctness of the IRS assessments at issue. Consequently, the plaintiffs prevail in this 100 percent penalty tax refund action.

## CONCLUSION

For the aforementioned reasons, this Court finds that:

1. Neither Mary L. Michaud nor James E. Michaud was a "responsible person" at any time between, and including the last quarter of 1985 and the third quarter of 1987.

2. Because neither Mary L. Michaud nor James E. Michaud was a "responsible person" during the time that Superior's tax delinquency accrued, the "after-acquired funds" doctrine does not apply to the funds acquired by the corporation after the date that each plaintiff became a "responsible person."

3. Because neither Mary L. Michaud nor James E. Michaud exhibited the requisite personal fault that is the epitome of willfulness, neither plaintiff is liable for a "willful" failure to pay over any trust fund taxes that may have existed in Superior's coffers on the date that each became a "responsible person."

4. By showing that they never simultaneously met the two prongs of the section 6672 test for personal liability, Mary L. Michaud and James E. Michaud have successfully rebutted the presumption of correctness of the IRS assessments at issue in this case.

The Court therefore holds that the plaintiffs prevail in this action and that each plaintiff is entitled to a refund of the payments made toward the assessed section 6672 penalties. Accordingly, the clerk shall enter judgment for Mary L. Michaud (Docket No. 92–822T) in the amount of $5.72 plus interest thereon as provided by law and for James E. Michaud (Docket No. 92–823T) in the amount of $40.04 plus interest thereon as provided by law. The clerk shall dismiss the defendant's counterclaim in both cases.

No costs.